MCI TELECOMMUNICATIONS
CORPORATION,
Petitioner,

v.

TEXAS UTILITIES ELECTRIC
COMPANY, Respondent.

No. 96–1080.

Supreme Court of Texas.

Argued Sept. 28, 1998.

Decided May 27, 1999.

Richard A. Valdes, Dallas, William L. Latham, Fort Worth, Robert B. Gilbreath, Dallas, for petitioner.

S. G. Johndroe, III, Shannon Gilbert, Clifton Matthew Terrell, Fort Worth, for respondent.

Justice HANKINSON delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice BAKER, Justice O'NEILL and Justice GONZALES join.

In this case, we address two issues: first, whether a licensee of rights to construct a transmission line along a railroad right-of-way was entitled to recover attorney's fees as a third-party beneficiary to a later contract; and, second, whether evidence presented at trial was legally sufficient to prove that construction along the right-of-way proximately caused poles in the transmission line to lean and would cause certain other poles to lean in the future.

Texas Utilities Electric Co. (TU) constructed a transmission line in the mid–1970s along the Missouri Pacific Railroad (MoPac) right-of-way pursuant to a 1973 license agreement between the predeces-

sors of TU and MoPac. In 1985, MCI contracted with MoPac for use of the same right-of-way to install a fiber optic cable. In 1992, TU discovered that four of the utility poles located along the right-of-way were leaning. TU sued MCI for past and future replacement costs of the poles' foundations under breach of contract and negligence theories. Specifically, TU claimed that it was a third-party beneficiary to MCI's contract with MoPac and that MCI's laying of the fiber optic cable had interfered with the lateral support of the poles, causing them to lean. MCI contended that its contract with MoPac did not make TU a third-party beneficiary and that the defective installation of the poles at inadequate depths caused the poles to lean, not MCI's laying of its cable.

The trial court ruled that TU was a third-party beneficiary to the contract between MCI and MoPac, MCI breached its contract with MoPac, and MCI was negligent in its installation of the cable. The court awarded TU $362,755 in past and future damages for negligence, $20,244 in prejudgment interest, and $82,000 in attorney's fees for breach of contract. The court of appeals affirmed, holding that TU was, in fact, a creditor beneficiary of the contract and that sufficient evidence supported the trial court's finding of negligence. 993 S.W.2d 663.

On application for writ of error, MCI complains that (1) the plain language of its contract with MoPac explicitly disavows the existence of any third-party beneficiaries; (2) there was no evidence of proximate cause to support the trial court's negligence finding; and (3) there was no evidence to support the trial court's award of damages. While we agree that TU is not a third-party beneficiary to MCI's contract with MoPac, we conclude that legally sufficient evidence sustains the trial court's findings of proximate cause and future damages. Consequently, we affirm the award of past and future damages for negligence, but reverse and render judgment that TU take nothing on its attorney's fees claim.

■ To resolve the third-party beneficiary question, we start with the contract at issue. In 1973, TU's predecessor, Texas Electric Service Company (TESCO), entered into a "Wire Line License" with MoPac's predecessor, which gave TESCO the nonexclusive right to install an electric transmission line on the railroad's right-of-way. Thereafter, TESCO built a transmission line, supported by steel poles, attached to concrete and steel foundations, in a six-mile area generally parallel to the railroad tracks. In 1985, MCI and MoPac entered into a contract by which MoPac granted MCI the right to construct and operate its fiber optic system along the same right-of-way.

The contract between MCI and MoPac was executed twelve years after TU obtained the license rights to build the transmission line. Section 10 of the contract addressed the prior rights of third parties in the railroad right-of-way, including the prior rights of licensees such as TU:

> MCI shall secure such permission as may be necessary on account of any other existing rights in any third party (including, without limitation, rights of ... licensees ... ).... MCI hereby agrees to exercise the herein granted rights in such a manner as not to interfere in any way with any existing prior rights.

The contract also addressed the rights of successors or assigns of MCI and MoPac. Section 26(a) provided that "[t]his agreement shall be binding upon and insure [sic] to the benefit of the parties hereto and their respective successors or assigns" with the "prior written consent of the other party." Section 26(b) provided that, "[n]otwithstanding the provisions of [section 26(a) ]," MCI and MoPac had "the right to sublease or assign this Agreement to their wholly-owned subsidiaries, or affiliates, or to a parent company." Finally, section 26(c) stated:

> Except as provided in this subparagraph, neither this Agreement, nor any term or provision hereof, nor any inclu-

sion by reference, shall be construed as being for the benefit of any party not in signatory hereto.

During 1985, MCI constructed a buried fiber optic system along the railroad right-of-way by trenching, laying the cable, and repacking the ground. In some places, the cable was laid within a few feet of the foundations of TU's transmission poles. In 1992, TU discovered that four of its poles were leaning. When TU replaced the old foundations with new foundations, it learned that MCI's cable was near the foundations. TU alleged that the foundations had been damaged by MCI's trenching operations.

At trial, TU argued that it was a third-party beneficiary to the contract between MCI and MoPac and, therefore, entitled to recover its attorney's fees as a result of MCI's breach of the contract. The trial court determined that TU was a licensee with rights in existence prior to and at the time of the contract. Additionally, the trial court concluded that TU met the three requirements of third-party beneficiary status: (1) TU was not a signatory to the agreement; (2) MCI and MoPac made the agreement for the benefit of TU as a member of the mentioned class of licensees; and (3) MCI and MoPac intended that TU benefit by the agreement.

The court of appeals affirmed. In particular, the court of appeals interpreted section 10 of the contract to confer creditor beneficiary status on TU. It concluded that section 10 evidenced the clear intent of MCI and MoPac to confer a benefit upon TU as a third-party beneficiary in that MCI was required to perform the contract in such a manner as not to interfere with TU's rights. 993 S.W.2d at 668.

MCI argues that the court of appeals erred because section 26 of the contract operated in the opposite manner, showing a clear intent to confer no benefit upon anyone other than the signatories, MCI and MoPac. Moreover, MCI points out that TU is not mentioned by name in the contract and that the class of "licensees" and others, including those "occupying or using the property concerned with Railroad's permission," to which TU belongs, is too broad to allow TU, as a member of the class, to be a third-party beneficiary. Furthermore, even if the "licensee" language is interpreted as giving some benefit to TU, (namely, imposing a duty on MCI to obtain permission "as necessary" from TU in order to construct the cable line), MCI contends that such an obligation does not evidence a clear intent to contract for the direct benefit of TU, but rather, at most, confers an incidental benefit. Finally, in light of the unambiguous language of section 26 and the legal presumption that parties contract only for themselves and not for the benefit of third parties, MCI asserts that TU cannot be a third-party beneficiary of the contract between MCI and MoPac.

TU responds that the court of appeals correctly affirmed the trial court's ruling because TU met the three requirements of third-party beneficiary status. In particular, TU argues that the "licensee" language sufficiently describes a specific class to which TU belongs and gives TU the right to grant or deny MCI permission to do certain acts "as may be necessary." According to TU, this language indicates that the contract was made for the direct benefit of TU. TU also asserts that MCI and MoPac intended to confer creditor beneficiary status on TU by stipulating that MCI would be required to honor TU's legal right to lateral support, as granted by MoPac in the earlier license agreement. Alternatively, TU points out that MCI's narrow reading of section 26(c), as denying any benefits to nonsignatories, nullifies sections 26(a) and (b), which, together, allow a sublessee or assignee of MCI or MoPac to benefit from the contract upon prior written consent of the other party.

■ Our analysis of the third-party beneficiary issue requires us to interpret the contract between MCI and MoPac. When a contract is not ambiguous, the construction of the written instrument is a question of law for the court. *See Coker v. Coker,*

650 S.W.2d 391, 393 (Tex.1983); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Myers v. Gulf Coast Minerals Management Corp.*, 361 S.W.2d 193, 196 (Tex.1962). We review the trial court's legal conclusions *de novo.* *See Barber v. Colorado Indep. Sch. Dist.*, 901 S.W.2d 447, 450 (Tex.1995). In light of the clear language in the contract that the agreement not be construed as being for the benefit of any nonsignatory, we conclude that TU is not a third-party beneficiary.

▮ The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract. *See House v. Houston Waterworks Co.*, 88 Tex. 233, 31 S.W. 179, 180 (Tex.1895); *see also Merrimack Mut. Fire Ins. Co. v. Allied Fairbanks Bank*, 678 S.W.2d 574, 577 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 315 (1979); 1 WILLISTON ON CONTRACTS § 356 (3d ed.1959). A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit. *See, e.g., Knox v. Ball*, 144 Tex. 402, 191 S.W.2d 17, 21 (1945); *Edds v. Mitchell*, 143 Tex. 307, 184 S.W.2d 823, 829–30 (1945); *Houston Waterworks*, 31 S.W. at 180.

▮ To qualify as one for whose benefit the contract was made, the third party must show that he is either a donee or creditor beneficiary of, and not one who is benefited only incidentally by the performance of, the contract. *See Republic Nat'l Bank of Dallas v. National Bankers Life Ins. Co.*, 427 S.W.2d 76, 80 (Tex.Civ. App.—Dallas 1968, writ ref'd n.r.e.); 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 779C (1951); *see also* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 302. One is a donee beneficiary if the performance promised will, when rendered, come to him as a pure donation. *See Brunswick Corp. v. Bush*, 829 S.W.2d

352, 354 (Tex.App.—Fort Worth 1992, no writ); *see also* 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 774. If, on the other hand, that performance will come to him in satisfaction of a legal duty owed to him by the promisee, he is a creditor beneficiary. *See Brunswick*, 829 S.W.2d at 354; *see also* 1 WILLISTON ON CONTRACTS § 356; 4 CORBIN ON CONTRACTS § 774. As the court of appeals noted, this duty may be an "indebtedness, contractual obligation or other legally enforceable commitment" owed to the third party. 993 S.W.2d at 670 (citing *M.J.R. Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 11 (Tex. App.—Dallas 1988, writ denied)).

▮ In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling. *See Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503–04 (Tex.1975). A court will not create a third-party beneficiary contract by implication. *See M.J.R. Corp.*, 760 S.W.2d at 12. The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. *See id.* Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract. *See Corpus Christi*, 525 S.W.2d at 503–4; *Knox*, 191 S.W.2d at 21; *see also M.J.R. Corp.*, 760 S.W.2d at 12.

We agree with MCI that TU is not a third-party beneficiary of the contract between MCI and MoPac; therefore, it cannot maintain an action to enforce the contract. First, TU is not an intended beneficiary of the contract. Section 10 acknowledges certain protections that TU is entitled to as an earlier licensee to the right-of-way. The contract does not, however, provide TU with a direct benefit. To the contrary, the unambiguous language of section 26 indicates that MCI and MoPac specifically intended not to secure a direct benefit to TU or any other nonsignatory. There is simply no con-

tractual language to indicate that MCI and MoPac entered into the contract directly for TU's benefit. *See M.J.R. Corp.*, 760 S.W.2d at 12. Thus, TU is not a creditor or donee beneficiary of the contract and, at best, is an incidental beneficiary of the contract. *See Brunswick*, 829 S.W.2d at 354 (holding that incidental beneficiaries have no enforceable rights); *M.J.R. Corp.*, 760 S.W.2d at 10 (same). Second, section 26(c) explicitly states that the contract is not to be interpreted as conferring any benefits on nonsignatory parties. This section reflects the intention of the parties that there be no third-party beneficiaries to the contract.

■ When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *See City of Midland v. Waller*, 430 S.W.2d 473, 478 (Tex.1968); *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951). Our interpretation of section 26 does not render section 10 wholly meaningless. While section 26(c) expressly disavows third-party beneficiaries, section 10 acknowledges certain rights of earlier licensees to the right-of-way. Thus, section 26(c) does not negate the contracted-for protection of these pre-existing licensee rights. Nor does section 26(c) nullify sections 26(a) and (b), which together allow a sublessee or assignee of either party to benefit from the contractual rights granted to the parties, provided the other party gives prior written consent. Section 26(c) does not deny benefits to all nonsignatories but, rather, only to those nonsignatories who are not sublessees or assignees under sections 26(a) and (b).

■ Furthermore, there is a presumption against, not in favor of, third-party beneficiary agreements. *Corpus Christi*, 525 S.W.2d at 503–04; *Knox*, 191 S.W.2d at 21; *M.J.R. Corp.*, 760 S.W.2d at 12. Absent clear indication in the contract that MCI and MoPac intended to confer a direct benefit to TU, TU may not maintain an action as a third-party beneficiary. *See M.J.R. Corp.*, 760 S.W.2d at 12. The contract between MCI and MoPac does not contain any such indication. Therefore, TU is not a third party-beneficiary, and the court of appeals erred in affirming the trial court's award of attorney's fees for breach of contract.

■ We now consider whether there is any evidence to support the trial court's finding that MCI's trenching activities proximately caused the poles to lean. MCI argues that there is no evidence that its trenching activities proximately caused some of the poles to lean or become susceptible to leaning. Specifically, MCI insists that there is no evidence that the lateral support the earth provided to the poles at the time they started leaning was any less than before MCI dug its trenches. MCI also makes a second sufficiency challenge, contending that the evidence conclusively establishes TU's foundation piles were so grossly inadequate to withstand severe storm load conditions that, as a matter of law, TU is solely responsible for the poles' leaning. We reject both of these challenges.

The record reveals that the TU transmission line near which MCI laid its cable is a double circuit line of six heavy conductors carrying 138 kV of power to serve Fort Worth's downtown business district and hospital district. Steel poles spaced about 300 feet apart from each other suspend the conductors an average of eighty-five feet above the ground. Most of the poles are set in foundation piles that are five feet wide and ten to twelve feet deep. These piles must be wide and deep enough and the surrounding soil strong and resilient enough to prevent lateral forces (loads) on the poles from permanently tilting or tipping them over.

Lateral loads are created by wind blowing against the poles and conductors and by the tension or pull of the six conductors on the poles. For straight-line poles, the tension in the conductors on one side of the poles is balanced by the tension on the

other side. "Angle" poles, on the other hand, are constantly loaded by the tension in the conductors. When ice storms coat the conductors with ice, the ice increases the tension in the conductors and the corresponding load on angle poles. Also, when either type of pole leans, it affects the tension in the conductors and imposes a load on adjacent poles.

A lateral load on a pole creates a moment tending to rotate the pole about an axis below the ground. To keep the pole in equilibrium, the soil surrounding the pile must provide enough lateral support to cancel out the lateral load and resulting moment. There are several engineering models that, for a pile of a given depth and width, approximate the maximum lateral soil support needed to counteract the lateral loading of a pole. For all of these models, the shallower or narrower the pile, the stronger and more resilient the soil must be to keep the pole erect.

TU's experts, Mike McWilliams and Dr. Phillip Buchanan, testified that TU designed its pole structures to withstand eighty-five mile per hour winds and one-inch radius ice loads around each conductor. They testified that before MCI's trenching activities, the leaning poles' piles were wide and deep enough and the surrounding soil strong enough to withstand such loads. MCI's trenching activities, they contend, reduced the ultimate lateral support that the earth could provide for the foundations, rendering the poles susceptible to tilting.

To support his opinion, Buchanan reviewed the original soil tests taken for the pole locations in 1973, as well as the configuration of the transmission line, soil tests conducted to determine soil strength for purposes of TU's new pole locations, and loading data. McWilliams testified about his experience with an MCI employee who located MCI's fiber optic cable in relation to TU's proposed new pole foundations. The employee told McWilliams that because the soil over MCI's cable was always much softer than the soil in nearby undisturbed areas, he could use a steel rod to probe for the cable. McWilliams testified that, based on his experience, this fact indicated a disturbance in soil strength as a result of MCI's trenching activity.

McWilliams also observed that of the 400 poles in TU's transmission line, only poles near MCI's trenching activities were leaning. Moreover, these poles did not begin to lean until after MCI trenched near the poles. MCI's construction plans and field tests of the actual location of MCI's cable indicated that MCI dug its trench as much as six-feet deep and twelve-inches wide within a few feet of these poles.

Much of the evidence at trial addressed MCI's defensive theory that the sole cause of the poles' displacement was that TU's foundation piles were not deep enough. Using one engineering model (the Broms method), MCI's experts calculated that TU's piles should have been sixteen to nineteen-feet deep to safely withstand the severe ice and wind storm conditions that TU claimed the poles were designed to withstand. To counter this testimony, Buchanan, using another engineering model (the Wiggins method), concluded that the existing pile depths were significantly more than adequate to withstand such conditions. Buchanan's calculations showed that the available unconfined compressive soil strengths of the soils around each pole, determined through lab tests of soil samples, were greater than the theoretical maximum soil strengths needed. However, on rebuttal, MCI's experts presented calculations based on the same formula used by Buchanan that yielded maximum needed soil strengths of two to five times the unconfined compressive strengths of the soils around each pole.

Buchanan could not readily explain the disparities between his and MCI's calculations. The trial court gave Buchanan an opportunity to review his calculations overnight and testify the next day. The next day, Buchanan attributed the discrepancy to the fact that he had substituted a value of two feet into a variable that accounted

for the effective height of the lateral load. We accept for purposes of this appeal that Buchanan's calculations were in error. Nevertheless, we conclude that MCI failed to prove as a matter of law that inadequate design solely caused the poles to be displaced. *See Smith v. Central Freight Lines, Inc.*, 774 S.W.2d 411, 412 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (requiring for sustaining an as-a-matter-of-law challenge "that the evidence conclusively [establish] all vital facts in support of the issue."); *see also* W. Wendell Hall, *Standards of Review in Texas*, 29 ST. MARY's L.J. 351, 481–82 (1998).

First, of the 400 transmission poles in this particular transmission line, all of which shared similar designs, the only leaning poles were those next to which MCI had trenched. Second, there is evidence that before MCI's trenching activities, the actual subsurface compressive soil strengths around the leaning poles were significantly greater than the unconfined compressive soil strengths with which Buchanan and MCI compared the theoretical maximum-needed soil strengths.

Both Buchanan and MCI compared the theoretical maximum soil strengths needed to resist the moments created by severe wind and ice loadings on the poles with the laboratory-tested unconfined compressive strengths of the soils surrounding the leaning poles. Both TU and MCI introduced literature, however, reciting experimental data showing that the ultimate compressive strength of cohesive soils typically increases with increasing depth (where the soil is confined) to values of up to six times the unconfined ultimate compressive soil strength. (*E.g.*, Plaintiff's Exh. 24, Bengt B. Broms, *Lateral Resistance of Piles in Cohesive Soils*, 2 J. SOIL MECH. & FOUNDATIONS DIV. 46–47 (1964)).

The trial court was entitled to evaluate the underlying facts revealed in the expert's testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). The trial court could have determined that at sufficient depths, the available soil strength is as much as six times the uncon-

fined compressive soil strength. This information, all of which is in the record, supports the inference that the available soil strength was greater than MCI's own calculations, based on the Wiggins model, for the maximum-needed soil strengths. In other words, available soil strengths of six times the unconfined compressive soil strengths are more than the two to five times the unconfined compressive soil strengths that MCI's calculations showed were required.

This evidence supports the conclusion that the soil originally provided enough lateral support against the pole foundations to prevent them from leaning. When considered in connection with the specific evidence of MCI's trenching activities and cable in close proximity to those poles that leaned, and the resulting disturbance in soil strength, the same evidence indicates that MCI's trenching activities were a but-for cause of the poles' displacement. This showing not only defeats MCI's matter-of-law challenge that inadequate foundation design solely caused the poles to lean, but also supports the trial court's finding that MCI's trenching activities proximately caused the poles to lean. We conclude that there is more than a scintilla of evidence that MCI's trenching activities reduced the ultimate compressive strength of the soil supporting the piles. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666, n. 9 (Tex.1990) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L.Rev. 361, 362–63 (1960)). Thus, legally sufficient evidence supports the trial court's finding that those activities proximately caused the poles to lean.

■■■■ MCI also challenges the sufficiency of the evidence to support the trial court's award of future damages. With respect to recovery of future damages, Texas follows the reasonable probability rule. *See Fisher v. Coastal Transport Co.*, 149 Tex. 224, 230 S.W.2d 522, 523 (1950). To meet the reasonable probability test, TU must: (1) present evidence that, in

reasonable probability, it will incur expenses in the future, and (2) prove the probable reasonable amount of the future expenses. *See Williams Distribut. Co. v. Franklin,* 884 S.W.2d 503, 510 (Tex.App.— Dallas 1994), *aff'd in part and rev'd in part on other grounds,* 898 S.W.2d 816 (Tex.1995).

TU's evidence consisted, in large part, of two data tables prepared by Buchanan. The first table represented approximately seventeen poles that were susceptible to movement, half of which, according to Buchanan, would, based on reasonable probability, require replacement. The second table represented five poles that, based on reasonable probability, would lean and need to be replaced. Buchanan explained that he developed criteria for categorizing the poles based on soil data for each pole location, the configuration of the transmission line, the proximity of MCI's cable to the poles, including whether the MCI cable was inside or outside the curves of the line, and loading data. In particular, Buchanan pointed out that all of the pole foundations in the second table were inside curve foundations, and thus were particularly susceptible to leaning in the future. McWilliams testified that he relied on Buchanan's tables, and his own experience in designing and constructing foundations for transmission lines, to estimate the cost of installing new foundations. Although Buchanan and McWilliams's testimony regarding future damages was brief, the trial court could have inferred that it was reasonably probable the other poles would lean as a result of MCI's construction. Therefore, legally sufficient evidence supports the trial court's award of future damages.

For the reasons explained above, we conclude that TU is not a third-party beneficiary of the contract between MCI and MoPac, and that the evidence was legally sufficient to support the conclusion that MCI's construction of the cable line proximately caused certain poles in TU's transmission line to lean and would cause certain other poles to lean in the future. We accordingly affirm the award of past and future damages for negligence, including prejudgment interest, but reverse and render judgment that TU take nothing on its attorney's fees claim.

Justice ABBOTT did not participate in the decision.