FIRST UNION NATIONAL BANK
n/k/a Wachovia Bank, N.A.,
Appellant,

v.

RICHMONT CAPITAL PARTNERS
I, L.P., Appellee.

No. 05–03–01686–CV.

Court of Appeals of Texas,
Dallas.

Aug. 1, 2005.

Brian J. Hurst and Daniel Patrick Elms, Baker & McKenzie, Dallas, for Appellant.

LaDawn H. Conway and Steven A. Harr, Munsch, Hardt Kopf & Harr P.C., Dallas, Dallas, for appellee.

Before Justices O'NEILL, LANG, and LANG–MIERS.

## OPINION

Opinion by Justice LANG.

First Union National Bank n/k/a Wachovia Bank, N.A., intervenor-plaintiff below, appeals the trial court's final summary judgment that it take nothing against Richmont Capital Partners I, L.P., defendant below. The underlying suit involves an intricate web of financial transactions which includes, among others, several multi-million dollar loans, a guaranty, a lender participation agreement, intercreditor agreements, and an intervening bankruptcy of a central party to the transactions.

First Union raises three issues on appeal: (1) the trial court erred when it granted summary judgment finding that, as a matter of law, First Union does not have a security interest in Richmont's Guaranty; (2) the trial court erred when it granted summary judgment finding that, as a matter of law, First Union was not an intended third party beneficiary of Richmont's Guaranty; and (3) the trial court erred when it granted summary judgment finding that, as a matter of law, Richmont was not unjustly enriched.

We conclude that the trial court did not err by granting Richmont's motion for final summary judgment. First Union's issues on appeal are decided against it. The trial court's final summary judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

From 1997 to March 30, 2000, First Union was the primary lender to Marketing Specialist Corporation, a food brokerage distribution company. This debt exceeded $34 million and was secured by a first lien security interest in a substantial amount of Marketing Specialist's assets.

On March 30, 2000, Marketing Specialist and The Chase Manhattan Bank entered into a Credit Agreement. The Credit Agreement gave Marketing Specialist an additional $50 million loan through a revolving credit facility from Chase. Richmont, a private venture capital firm, signed a Guaranty on March 30, 2000, guaranteeing payment to Chase of up to $10 million of the Chase $50 million loan.

Because First Union and Chase claimed an interest in the same collateral of Marketing Specialist, they executed an Intercreditor Agreement dated March 30, 2000. The Intercreditor Agreement set out the priority of rights in Marketing Specialist's collateral and the order of payment to the lenders. Richmont, the guarantor, was not a party to the Intercreditor Agreement.

Later, in November of 2000, Marketing Specialist needed additional financing. Hence, four additional agreements were

executed which must be addressed in our analysis.

First, on November 17, 2000, in order to increase the Chase loan to $60 million, Marketing Specialist and Chase executed a Second Amendment to Credit Agreement. Under the terms of the Second Amendment to Credit Agreement, the $60 million loan from Chase was divided into two parts: (1) Tranche A, a $41 million loan; and (2) Tranche B, a $19 million loan. It also provided that all payments on the Chase loan were to be applied to Tranche A until the debt within that part of the facility was paid in full and then additional payments were to be applied to reduce the debt in Tranche B.

Second, on November 17, 2000, MS Acquisition, a third party and subsidiary of Richmont, entered into a Master Participation Agreement with Chase. Under the terms of the Master Participation Agreement, MS Acquisition: (1) purchased a 100 percent participation interest in the Tranche B component of the Chase credit facility; (2) gained the right to be paid any amounts received by Chase on the Tranche B portion of the loan; and (3) gave Chase the unilateral right to agree to "any amendment, modification, restructure, waiver, substitution, or release of any terms of any portion of the Loan Documents."

Third, on November 17, 2000, Richmont executed an Obligated Party Consent, which was attached to the Second Amendment to Credit Agreement between Chase and Marketing Specialist. The Obligated Party Consent expanded the Guaranty to cover the Tranche A and Tranche B components of the Chase credit facility, but the Guaranty remained limited to a total of $10 million.

Fourth, on November 17, 2000, Marketing Specialist, Chase, First Union, MS Acquisition, and Richmont executed an Amended Intercreditor Agreement, which added an "Additional Collateral" category. In section 2.21 of the Amended Intercreditor Agreement, the parties agreed that each secured party would not accept as security for the Chase or First Union loans any "Additional Collateral," unless each secured party is granted a perfected security interest in the "Additional Collateral." Section 2.6 of the Amended Intercreditor Agreement directs that proceeds from "Shared Collateral" will be applied first to Tranche A of the Chase loan, second to the First Union loan, and third to Tranche B of the Chase loan in which MS Acquisition purchased a 100 percent participation interest.

Marketing Specialist filed for chapter 11 bankruptcy protection on May 24, 2001. This triggered a suit by Chase against Richmont for payment under the Guaranty. First Union intervened in the litigation asserting: (1) a right to payment under the Guaranty by seeking enforcement of its security interest in MS Acquisition's right to payment under the Guaranty; (2) in the alternative, claiming it was an intended third party beneficiary of the Guaranty and seeking enforcement of payment under the Guaranty directly to First Union; and (3) in the alternative, claiming that Richmont was unjustly enriched through its failure to pay the proceeds of the Guaranty to MS Acquisition.

Richmont filed its first motion for traditional summary judgment seeking judgment, as a matter of law, on First Union's claims. The trial court granted Richmont's first motion for traditional summary judgment, in part, concluding First Union had no security interest in the Guaranty and denied the motion, in part, with respect to First Union's remaining claims.

After Richmont's first motion for summary judgment and, while First Union's remaining claims were still pending, Chase and Richmont settled their dispute. Their settlement reduced Richmont's liability to Chase from $10 million to $7.8 million. Then, Chase accepted $7.8 million in exchange for a release of its claims.

Richmont filed a second motion for traditional summary judgment seeking judgment, as a matter of law, against First Union on its claim that it is a third party beneficiary of the Richmont Guaranty. The trial court granted this motion. Then, Richmont filed a third motion for traditional summary judgment seeking judgment, as a matter of law, on First Union's remaining unjust enrichment claim. The trial court granted the motion and issued its final summary judgment ordering that First Union take nothing on any of its claims.

In three issues, First Union appeals the trial court's final summary judgment. Our analysis will proceed from First Union's third issue regarding whether it had a security interest in the Guaranty, to First Union's second issue regarding whether it is a third party beneficiary of the Guaranty, and finally to First Union's first issue regarding its unjust enrichment claim. The conclusions on each of First Union's issues build logically in that sequence to a conclusion.

## II. TRADITIONAL SUMMARY JUDGEMENT STANDARD OF REVIEW

 The standard for reviewing a traditional summary judgment is well-established. *See Sysco Food Servs. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied). A party moving for traditional summary judgment carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) (per curiam). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982). When reviewing a motion for summary judgment, the court takes the nonmovant's evidence as true, indulges every reasonable inference in favor of the nonmovant, and resolves all doubts in favor of the nonmovant. *Willrich,* 28 S.W.3d at 23–4. When a trial court's order does not specify the grounds for its summary judgment, an appellate court must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life and Acc. Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003).

## III. SECURITY INTEREST IN THE GUARANTY

In its third issue on appeal, First Union argues the trial court erred when it granted summary judgment finding that, as a matter of law, First Union does not have a security interest in Richmont's Guaranty. First Union claims that: (1) because there is no specific definition of "Additional Collateral" in the Amended Intercreditor Agreement, there is a fact issue regarding whether the parties intended Richmont's Guaranty to be included within the provision entitled, "Additional Collateral"; (2) "the parties' failure to specifically *exclude* guaranties from this broad definition [of

'Additional Collateral'] evidences their intent to include them" [emphasis in orig.]; and (3) Marketing Specialist *obtained the* Guaranty for the purpose of providing additional security for the Chase loan and, because it is axiomatic that collateral is security for a loan, First Union has a security interest in the Guaranty. Richmont responds that First Union did not assert that the meaning of "Additional Collateral" is unclear because of ambiguity and evidence of intent is not admissible to explain the meaning of an unambiguous contract. Also, Richmont responds to First Union's assertions by arguing First Union was aware of the Guaranty because the Guaranty is included in the recital in paragraph "F" of the Amended Intercreditor Agreement and, if they intended to address the rights and issues affecting the Guaranty, they could have done so by specific reference. We agree with Richmont.

### A. Applicable Law

■ Agreements executed at the same time, with the same purpose, and as part of the same transaction, are construed together. *In re Prudential Ins. Co. of America*, 148 S.W.3d 124, 135, (Tex.2004). It is a basic premise of contract interpretation that unambiguous contracts are construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Pratt–Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 829 (Tex.App.-Dallas 2003, no pet.). The entire instrument, taken by its four corners, must be read and considered to determine the true intention of the parties. *Pratt–Shaw*, 122 S.W.3d at 829; *Dedier v. Grossman*, 454 S.W.2d 231, 234 (Tex.Civ. App.-Dallas 1970, writ ref'd n.r.e.). We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118,

121 (Tex.1996); *Pratt–Shaw*, 122 S.W.3d at 829.

■ When interpreting a contract, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1999); *Pratt–Shaw*, 122 S.W.3d at 829. We presume that the parties to a contract intend every clause to have some effect. *Heritage Res., Inc.*, 939 S.W.2d at 121; *Pratt–Shaw*, 122 S.W.3d at 829. When interpreting a promise or agreement, "[s]pecific and exact terms are given greater weight than general language." *Pratt–Shaw*, 122 S.W.3d at 829.

■ A guaranty of payment creates a secondary obligation where the guarantor promises to pay the debt when due if the debtor fails to perform. *See Rep. Nat. Bank of Dallas v. Northwest Nat. Bank of Fort Worth*, 578 S.W.2d 109, 114 (Tex. 1978); *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex.App.-Houston [14th Dist.] 1997, no pet.). Because a guaranty is ancillary to the underlying contract, a dispute as to the rights and obligations of the guarantor can only be resolved by a factual determination of the rights and obligations of the parties to the underlying contract. *Rep. Nat. Bank*, 578 S.W.2d at 114; *Pham v. Mongiello*, 58 S.W.3d 284, 288 (Tex.App.-Austin 2001, pet. denied).

■ The rule of *strictissimi juris* applies so that a guaranty agreement is construed strictly in favor of the guarantor under Texas law. *See Reece v. First State Bank of Denton*, 566 S.W.2d 296, 297 (Tex. 1978); *Cox*, 949 S.W.2d at 530. This rule prohibits the extension, by construction or implication, of the guarantor's obligations beyond the written terms of the agreement. *See Reece*, 566 S.W.2d at 297; *Preston Ridge Financial Services Corp. v.*

*Tyler,* 796 S.W.2d 772, 780 (Tex.App.-Dallas 1990, writ denied); *Pham,* 58 S.W.3d at 288; *Cox,* 949 S.W.2d at 530. However, the rule of *strictissimi juris* applies after the terms of the guaranty agreement have been ascertained. *Preston Ridge,* 796 S.W.2d at 780.

## B. Application of the Law to the Facts

First, we address First Union's argument that because there is no specific definition of "Additional Collateral" in the Amended Intercreditor Agreement, there is a fact issue regarding whether the parties intended Richmont's Guaranty to be included within the provision entitled, "Additional Collateral." Richmont responds that because the agreement is unambiguous, evidence of intent is not admissible to explain the meaning of an unambiguous contract, and had the parties intended for the Guaranty to be included within "Additional Collateral," they could have done so by specific reference.

Although the parties do not dispute that the Amended Intercreditor Agreement is unambiguous, they disagree on the effect of its provision concerning "Additional Collateral." The Amended Intercreditor Agreement states the following regarding "Additional Collateral":

Section 2.21. *Additional Collateral.*

(a) Each Secured Party agrees that it shall not accept, either directly or indirectly, as security for any of the [Chase] Obligations or the [First Union] Obligations, any additional collateral from any Person (the "Additional Collateral"), other than Secured Collateral and Other Collateral, unless each Secured Party is granted a perfected security interest in such Additional Collateral. Additional Collateral shall, for all purposes be treated as Shared Collateral.

(b) If [sic] furtherance of clause (a) above:

(i) MS Acquisition and Richmont each hereby grant to [First Union], a security interest in any Additional Collateral which they provide to [Chase].

(ii) [Chase] agrees to hold for the benefit of the Lenders, as Shared Collateral hereunder, any such Additional Collateral received by it.

The term "Additional Collateral" is not defined in the Amended Intercreditor Agreement.[1]

1. The Amended Intercreditor Agreement does not define the term "Secured Collateral." Also, the Amended Intercreditor Agreement states the following regarding "Other Collateral":

Section 2.3. *Other Collateral; License in Intellectual Property.* In addition to [First Union's] security interests in the Shared Collateral, [First Union] also holds, or may in the future hold, mortgages and security interests in all other assets of [Marketing Specialist], including without limitation, all real property interests, equipment, fixtures, stock of subsidiaries, Intellectual Property, insurance policies (other than casualty insurance specifically relating to a casualty loss with respect to Shared Collateral), and proceeds thereof (the "Other Collateral").

[First Union] acknowledges that any right, title or interest it holds in Other Collateral consisting of Intellectual Property is subject to the licenses granted by [Marketing Specialist] in favor of [Chase] pursuant to the [Chase] Loan Documents permitting [Chase] to use such Intellectual Property in connection with the sale or other disposition of any Shared Collateral. In furtherance of the foregoing, and to the extent of [First Union's] interest in the Intellectual Property, [First Union] also hereby grants to [Chase] an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to [First Union]) to use any of the Intellectual Property for purposes of enabling [Chase] to exercise its rights and remedies under the [Chase]

The definition section of the Amended Intercreditor Agreement refers to Exhibit A for a definition of "Shared Collateral." Exhibit A states, in part:

### Shared Collateral

"Shared Collateral" means (i) the Additional Collateral described in Section 2.21 of the [Amended Intercreditor Agreement], and (ii) all of right, title and interest of each Debtor in and to the following, whether now owned or hereafter arising or acquired and wherever located (collectively, the "Collateral"):

(a) all Accounts;

(b) all Inventory;

(c) all Deposit Accounts and all funds, certificates, Documents, Instruments, checks, drafts, wire transfer receipts and other earnings, profits or other Proceeds from time to time representing, evidencing, deposited into or held in the Deposit Accounts; and

(d) all Instruments, Financial Assets, other Investment Property, Documents, Chattel Paper, General Intangibles, products and Proceeds evidencing title to, or the right to possession of, arising from the sale or other disposition of, necessary for or used in connection with the production, manufacture, sale or other disposition of, or otherwise relating to, or arising or created out of the property described in the foregoing clauses (a) through (c).

Notwithstanding the definition above, Collateral shall not include any Debtor's equipment, fixtures, Intellectual Property, real estate, insurance policies (other than casualty insurance specifically relating to a casualty loss with respect to

Documents and enabling [Chase] to enjoy the full benefits of the Shared Collateral (in

Shared Collateral) or stock of subsidiaries, or any Proceeds thereof (other than proceeds of casualty insurance specifically relating to a casualty loss with respect to Shared Collateral).

Because First Union does not argue the Amended Intercreditor Agreement is ambiguous, it is construed as a matter of law. *See Coker,* 650 S.W.2d at 393; *Pratt–Shaw,* 122 S.W.3d at 829. The entire Amended Intercreditor Agreement must be read and considered within its four corners to determine the true intention of the parties. *See Pratt–Shaw,* 122 S.W.3d at 829; *Dedier,* 454 S.W.2d at 234. While the Amended Intercreditor Agreement provides First Union an undivided interest in "Additional Collateral," there is no specific term or other language identifying the Guaranty as "Additional Collateral" or including it within the terms setting out the priority of rights in the Amended Intercreditor Agreement. *See Pratt–Shaw,* 122 S.W.3d at 829 (when interpreting unambiguous language specific and exact terms are given greater weight than general language).

 Second, we address First Union's claim that in the absence of a specific definition of "Additional Collateral" in the Amended Intercreditor Agreement, we should look to the common, ordinary meaning of the word "collateral." We are advised by First Union that such an analysis will lead us to conclude that the Guaranty is "collateral" in which First Union holds a security interest. We are also advised by First Union that we can find such common meaning using two sources. The first source to which we are directed is Webster's New World Dictionary where "collateral" is defined as "anything, such as stocks or bonds, that secures or *guarantees* the discharge of an obligation."

each case as [Chase] shall be entitled under the [Chase] Documents).

WEBSTER'S NEW WORLD DICTIONARY 274 (3d college ed.1988)[emphasis added]. The second is § 9.102(a)(12) of the Texas Business and Commerce Code which defines "collateral" as the property subject to a security interest or agricultural lien, including: (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and (C) goods that are the subject of a consignment. *See* TEX. BUS. & COM.CODE ANN. § 9.102(a)(12) (Vernon 2002).

We agree generally with First Union that a court should interpret terms using their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used them in a technical or different sense. *Heritage Res., Inc.*, 939 S.W.2d at 121; *Pratt–Shaw*, 122 S.W.3d at 829. However, we disagree with First Union's argument that these dictionary or statutory definitions of collateral support the characterization of the Guaranty as "Additional Collateral" in the Amended Intercreditor Agreement.

The dictionary does not define a guaranty as collateral. Rather, that definition identifies "collateral" as "anything, such as stocks or bonds, that secures or *guarantees*" an obligation. [emphasis added]. First Union does not describe how this dictionary definition should cause us to construe the term "collateral" to include the Guaranty except that it "secures or guarantees" an obligation. The operative language in the definition describes "anything such as stocks and bonds." We do not see that the Guaranty can be considered to be like "stocks or bonds." Likewise, we cannot agree the Guaranty is within the list of property which may be subject to a security interest as set out in § 9.102(a)(12). That list does not refer to guaranties. Accordingly, we cannot conclude that these definitions reflect a com-

mon and generally accepted meaning of "collateral" which would operate to include the Guaranty within the "Additional Collateral" provision of the Amended Intercreditor Agreement.

Third, we address First Union's position that because Marketing Specialist obtained the Guaranty for the purpose of providing additional "security" for the Chase loan, it should be considered collateral. Therefore, First Union asserts that, pursuant to the Amended Intercreditor Agreement, it has a security interest in the Guaranty. First Union contends its position is supported by this Court's opinion in *Preston Ridge*, which First Union contends recognizes a guaranty as a means of "securing" a debt. *Preston Ridge*, 796 S.W.2d at 778, 781.

In *Preston Ridge*, the appellee executed a guaranty agreement in which he guarantied all amounts of principal due under a note in excess of $735,000. The guarantor agreed to pay, immediately upon demand, the guarantied portion of the indebtedness if the maker defaulted on the note. The note was also secured by a deed of trust on which the lender foreclosed. The guarantor argued the foreclosure proceeds should be applied to reduce the portion of the debt he guarantied. *See Preston Ridge*, 796 S.W.2d at 778. He argued that because he was not required to pay until the lender made demand, his liability should be fixed at the time of demand, which occurred after foreclosure. This court disagreed with that proposition.

First Union's reliance on *Preston Ridge* is misplaced. In *Preston Ridge*, this Court did not conclude the guaranty was "collateral." Rather, this Court referred to the guaranty only as additional "security." In fact, the guaranty was contrasted with the collateral in the loan package. We said the guaranty was required because the parties " . . . realized the value of the col-

lateral under the deed of trust" may not be sufficient in the future. *Preston Ridge,* 796 S.W.2d at 779. The guaranty was enforced according to its terms and required the guarantor to pay the sums required to be paid, (*i.e.,* amounts owed in excess of $735,000, at the time the debt was due, owing, and unpaid). The guaranty in *Preston Ridge* was not conditional or contingent on the enforcement of any remedies against the borrower, on the assertion of any lien right, or realization on any other security interest available to the lenders.

■ Finally, it does not follow that the Guaranty can be an asset subject to the Amended Intercreditor Agreement. That agreement encompasses collateral that is property of the borrower, Marketing Specialist. On this record, we cannot characterize the Guaranty as property of Marketing Specialist. Rather, it is an independent contractual obligation of Richmont to Chase. The Amended Intercreditor Agreement does not in any way purport to assign to First Union any of Chase's rights in the Richmont Guaranty. That Guaranty was payable directly and only to Chase.

We conclude the trial court did not err when it granted summary judgment finding that, as a matter of law, First Union does not have a security interest in Richmont's Guaranty.

First Union's third issue on appeal is decided against it.

## IV. INTENDED THIRD PARTY BENEFICIARY

In its second issue on appeal, First Union argues the trial court erred when it granted summary judgment finding that, as a matter of law, First Union was not an intended third party beneficiary of the Richmont Guaranty. First Union contends that whether it was an intended third party beneficiary of the Guaranty is an issue of material fact precluding summary judgment because MS Acquisition was contractually required to pay any money it received on its participation interest in Tranche B to First Union pursuant to the terms of the Amended Intercreditor Agreement. Further, the Guaranty was extended to Tranche B pursuant to the terms of the Obligated Party Consent. Richmont responds that a plain reading of the controlling documents demonstrates First Union is not a third party beneficiary of the Guaranty. Rather, under the Amended Intercreditor Agreement, the Guaranty is not "Additional Collateral," which is to be treated as "Shared Collateral." The proceeds payable under the Guaranty were payable to Chase only. However, any guaranty payments were subject to prioritization between the parties only because the Tranche A debt was to be paid before the Tranche B debt under the Second Amendment to Credit Agreement. We agree with Richmont.

### A. Applicable Law

■ A third party may recover on a contract made between other parties only if: (1) the other parties intended to secure some benefit for that third party; and (2) the contracting parties entered into the contract directly for the third party's benefit. *MCI,* 995 S.W.2d at 651.

■ To show the other parties intended to secure some benefit for the third party, the third party must demonstrate he is either a donee or creditor beneficiary of the performance of the contract. *See MCI,* 995 S.W.2d at 651; *Dallas Firefighters Ass'n v. Booth Research Group, Inc.,* 156 S.W.3d 188, 192–93 (Tex.App.-Dallas 2005, pet. denied). A third party is a donee beneficiary if the performance promised under the contract will, when

rendered, come to the third party as a pure donation. *See MCI*, 995 S.W.2d at 651. A third party is a creditor beneficiary if the performance comes to the third party in satisfaction of a legal duty owed to that third party by the promisee. *See id.* The legal duty owed to a creditor beneficiary by the promisee may be an indebtedness, contractual obligation, or other legally enforceable commitment. *See id.* The fact that a third party might receive an incidental benefit from a contract does not give that third party a right to enforce the contract. *See id.*

 The intention to contract or confer a benefit to a third party must be clearly and fully spelled out in order to show the contracting parties entered into the contract directly for the third party's benefit. *See id.* A presumption exists that the parties contracted for themselves, unless it "clearly appears" that they intended a third party to benefit from the contract. *Id.; Dallas Firefighters*, 156 S.W.3d at 193. The intention of the contracting parties is controlling when determining whether a third party can enforce a contract. *MCI*, 995 S.W.2d at 651; *Dallas Firefighters*, 156 S.W.3d at 193. A court will not create a third-party beneficiary contract by implication. *MCI*, 995 S.W.2d at 651; *Dallas Firefighters*, 156 S.W.3d at 193. If there is any reasonable doubt as to the intent of the contracting parties to confer a direct benefit on the third party, then the third-party beneficiary claim must fail. *Dallas Firefighters*, 156 S.W.3d at 193; *Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 312 (Tex.App.-Dallas 2001, no pet.); *see MJR Corp. v. B & B Vending Co.*, 760 S.W.2d 4, 10 (Tex.App.-Dallas 1988, writ denied).

### B. Application of the Law to the Facts

First Union argues: (1) it is "intuitive" that if MS Acquisition was required to forward all payments to First Union under the Amended Intercreditor Agreement until its loans were fully satisfied, then First Union was a third party beneficiary of the Guaranty; and (2) "if Richmont ever made a payment under the Guaranty to MS Acquisition" because the Tranche A and First Union loans were already paid, then Richmont was paying itself.

 First, in order to address First Union's contentions, we scrutinize the Guaranty. The Guaranty is for the benefit of Chase and states the following:

> 14. This Guaranty Agreement is for the benefit of [Chase] and the banks and their successors, assigns and participants, and in the event of an assignment of the Guaranteed Indebtedness, or any part thereof, the rights and benefits hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. This Guaranty Agreement is binding on [Richmont], but not on [Richmont's] successors and assigns.

Obviously, First Union was not a party to the Guaranty.

Second, we must review the language of the subsequently executed Obligated Party Consent, which was attached to the Second Amendment to Credit Agreement. That document states:

> *Obligated Party Consent*
>
> Richmont: (i) consents and agrees to this Amendment; (ii) agrees that the Loan Documents to which it is a party shall remain in full force and effect and shall continue to be its legal, valid and binding obligation enforceable against it in accordance with their respective terms; (iii) agrees that the obligations, indebtedness and liabilities of [Market-

ing Specialist] arising under this Amendment and the Notes executed pursuant hereto are "Obligations" as that term is used in the Guaranty Agreement dated March 30, 2000 executed by Richmont in favor of [Chase] (the "Guaranty") and "Guaranteed Indebtedness" as defined in the Guaranty; (iv) agrees that it remains obligated on the Guaranty for the "Guaranteed Indebtedness" defined therein in an amount up to $10,000,000; (v) acknowledges that it has transferred (and hereby does transfer) all of its right, title and interest in and to the Richmont Deposit and MS Deposit to MS Limited and waives any right, title or interest therein. . . .

First Union is not identified as an intended third party beneficiary in the Obligated Party Consent.

Third, we review the Amended Intercreditor Agreement in conjunction with the above agreements. The Amended Intercreditor Agreement provides for the subordination to the First Union loan of MS Acquisition's right to payment from the proceeds of collateral on the Tranche B portion of the Chase loan. However, as previously discussed, the Amended Intercreditor Agreement does not specifically define "Additional Collateral" to include the Guaranty and the only specific reference to the Guaranty is a mere recital in paragraph "F" that Richmont has guaranteed a portion of Marketing Specialist's indebtedness to Chase.

First Union's interpretation does not "clearly appear" on any of the documents and the documents do not "clearly and fully spell out" that Richmont and Chase intended the Guaranty to be directly and primarily for the benefit of First Union. See MCI, 995 S.W.2d at 651; Dallas Firefighters, 156 S.W.3d at 193. It is not "unmistakable" that a benefit to First Un-

ion was within Richmont's and Chase's contemplation. See Dallas Firefighters, 156 S.W.3d at 193. At most, in its proof, First Union shows that the documents "imply" it is a third party beneficiary of the Guaranty. However, implication does not create a third-party beneficiary contract in favor of First Union or defeat the presumption that Chase and Richmont contracted for themselves. See MCI, 995 S.W.2d at 651; Dallas Firefighters, 156 S.W.3d at 193. To survive summary judgment, First Union must come forward with more than mere intuition, conclusory allegations, improbable inferences, and unsupported speculation. See Chhim v. University of Houston, 76 S.W.3d 210, 218–19 (Tex.App.-Texarkana 2002, pet. denied); Fenley v. Mrs. Baird's Bakeries, Inc., 59 S.W.3d 314, 320 (Tex.App.-Texarkana 2001, pet. denied).

We conclude the trial court did not err when it granted summary judgment finding that as a matter of law First Union was not an intended third party beneficiary of the Guaranty.

First Union's second issue on appeal is decided against it.

## V. UNJUST ENRICHMENT

In its first issue on appeal, First Union argues the trial court erred when it granted summary judgment finding that as a matter of law Richmont was not unjustly enriched. First Union contends there is an issue of fact precluding summary judgment because Richmont was unjustly enriched by $2.2 million as a result of Richmont's settlement with Chase, which permitted Richmont to reduce the guaranteed amount from $10 million to $7.8 million. Richmont responds that MS Acquisition had no payment obligation to First Union and First Union's unjust enrichment claim is barred by the express

contracts. Once again, we agree with Richmont.

### A. Applicable Law

 The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution. *Burlington Northern R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92, 96 (Tex.App.-Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex.1998). A party may recover under a theory of unjust enrichment when one party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex.1998); *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). However, unjust enrichment is not a proper remedy merely because it "might appear expedient or generally fair that some recompense be afforded for an unfortunate loss" to the claimant, or because the benefits to the party sought to be charged amount to a windfall. *Heldenfels*, 832 S.W.2d at 42. The doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract. *Burlington Northern*, 925 S.W.2d at 97.

 The unjust enrichment doctrine applies the principles of restitution to disputes which are not governed by a contract between the contending parties. *Burlington Northern*, 925 S.W.2d at 97. Unjust enrichment claims are based on quasi-contract and are predicated on the absence of an express contract controlling the circumstances. *See Fortune Production Co. v. Conoco*, Inc., 52 S.W.3d 671, 683 (Tex.2000); *Atlantic Lloyds Ins. Co. v. Butler*, 137 S.W.3d 199, 227 (Tex.App.-Houston [1st Dist.] 2004, pet. denied);

*Inglish v. Prudential Ins. Co.*, 928 S.W.2d 702, 706 (Tex.App.-Houston [1st Dist.] 1996, writ denied). Generally, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory because parties should be bound by their express agreements. *See Fortune Production Co.*, 52 S.W.3d at 683; *Burlington Northern*, 925 S.W.2d at 97. Further, the doctrine of unjust enrichment does not apply when the contractual duty at issue has been performed. *Burlington Northern*, 925 S.W.2d at 97.

### B. Application of the Law to the Facts

 First Union contends there are fact issues precluding summary judgment because: (1) the forgiven $2.2 million was owed to MS Acquisition; (2) First Union has a right to that $2.2 million because Richmont expanded the Guaranty in the Obligated Party Consent to include MS Acquisition's participation interest in Tranche B; and (3) MS Acquisition was required to forward all funds to First Union. First Union also claims that "if funds had been paid to MS Acquisition, [those funds] would have been immediately payable to First Union," and "Richmont's corporate ownership and control over MS Acquisition is the *only* reason MS Acquisition has not already demanded and recovered that $2.2 million." [emphasis in orig.]. However, First Union does not argue or point this court to any summary judgment evidence that would show actual control of MS Acquisition by Richmont. Accordingly, we must determine if an express contract controls the rights of the parties, thereby precluding recovery by First Union under a quasi-contract theory of unjust enrichment.

First Union's unjust enrichment claim arises essentially out of the Amended Intercreditor Agreement. In the Amended

Intercreditor Agreement, the parties agreed that First Union would have a security interest in the "Additional Collateral" and they agreed that MS Acquisition's right to payment under Tranche B would be subordinate to First Union's right to payment under the First Union loan. As we determined in our discussion of First Union's third and second issues on appeal, the Amended Intercreditor Agreement did not give First Union a security interest in the Guaranty or establish that it was a third party beneficiary of the Guaranty. First Union could have bargained with Chase expressly to agree that First Union obtain an interest in the Guaranty and to describe that interest in the Amended Intercreditor Agreement. No such agreement between First Union and Chase was set out in any of the written agreements.

The doctrine of unjust enrichment does not operate to rescue First Union from the consequences of a bad bargain, and the settlement agreement between Chase and Richmont permitting Richmont to execute the Amended Guaranty reducing Richmont's liability by $2.2 million is not unjust where it is permissible under the terms of the parties' express agreements. *See Burlington Northern*, 925 S.W.2d at 97. Because First Union had no right to payment under the Guaranty, Richmont was not unjustly enriched by $2.2 million as a result of its settlement with Chase.

We conclude the trial court did not err when it granted summary judgment finding that, as a matter of law, Richmont was not unjustly enriched.

First Union's first issue on appeal is decided against it.

## VI. CONCLUSION

We conclude the trial court did not err when it granted summary judgment finding that, as a matter of law: (1) First Union does not have a security interest in Richmont's Guaranty; (2) First Union was not an intended third party beneficiary of the Guaranty; and (3) Richmont was not unjustly enriched. We decide First Union's three issues on appeal against it.

The trial court's final summary judgment is affirmed.