**Elizabeth PAZARIN, Plaintiff,**

**v.**

**Jay J. ARMES, Individually and d/b/a The Investigators, Defendant.**

**No. EP–06–CA–143–FM.**

United States District Court,
W.D. Texas,
El Paso Division.

June 7, 2007.

Mark Taylor Davis, Law Office of Mark T. Davis, El Paso, TX, for Plaintiff.

Carl H. Green, Andres Eduardo Almanzan, Mounce, Green, Myers, Safi & Galatzan, P.C., El Paso, TX, for Defendant.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT JAY J. ARMES'S MOTION FOR SUMMARY JUDGMENT

FRANK MONTALVO, District Judge.

Before the Court is Defendant Jay J. Armes's ("Armes") "Motion for Summary Judgment" ("Motion") [Rec. No. 36], filed through counsel on January 26, 2007. Therein, Armes urges the Court to enter summary judgment in his favor and dismiss Plaintiff Elizabeth Pazarin's ("Pazarin") "Original Complaint" ("Complaint") [Rec. No. 1] with prejudice. Pazarin filed her "Response to Defendant's Motion for Summary Judgment and Supporting Brief" ("Response") [Rec. No. 49] on April 27, 2007.[1] Armes's "Reply to Plaintiff's

---

1. As noted above, Armes filed his Motion on January 26, 2007. Pursuant to the Western District of Texas's Local Court Rules, Pazarin had eleven days to file her Response. *See* LCVR CV–7(d) (stating that a party who opposes a motion shall file a response within eleven days of the motion's service). Armes certifies he served his Motion on Pazarin by certified mail on January 26, 2007. *See* Def.'s Mot. for Summ. J., Rec. No. 36, at 19. Service by mail is complete upon mailing. Fed. R.Civ.P. 5(b)(2)(B). Pazarin's Response was therefore due by February 9, 2007. *See* Fed. R.Civ.P. 6(a) (setting forth the method for calculating time periods under the Federal Rules of Civil Procedure); Fed.R.Civ.P. 6(e) (adding three days to the response period when service is made by mail pursuant to Federal Rule of Civil Procedure 5(b)(2)(B)).

Pazarin, however, did not file a Response within this time period or otherwise communicate with the Court. Rather, in motions filed on March 23, 2007 [Rec. Nos. 42 and

Response to Defendant's Motion for Summary Judgment" ("Reply") [Rec. No. 52] followed on May 14, 2007.[2] After considering the Parties' arguments and the undisputed evidence before it, the Court concludes it should deny Armes's Motion.

## I. BACKGROUND

Although the Parties dispute the details of their interactions, they generally agree to the following. This cause arises from the kidnapping of Pazarin's brother-in-law, Juan Pazarin ("Juan") in Tijuana, Mexico and Pazarin's efforts to secure his release. To this end, Pazarin engaged Armes's in-vestigative services for the sum of $100,000.[3] Shortly after retaining Armes's services, however, Pazarin decided to rely instead on the services of Mexican investigators or negotiators. She directed Armes to cease any work on her behalf and later asked Armes to return the $100,000 sum. Armes refused to return any portion of the money, asserting his fee was non-refundable.

Pazarin filed her Complaint through counsel in the Western District of Texas, El Paso Division, on April 11, 2006, seeking to recover the $100,000 she paid Armes and associated damages.[4] Pazarin's Complaint sets forth three bases for recovery under Texas law.[5]

---

43], Pazarin's counsel of record sought permission to withdraw from the case and a continuance of the trial setting to allow his client to obtain new counsel. The Court denied Pazarin's counsel leave to withdraw in an Order [Rec. No. 45] dated March 30, 2007. In the same Order, finding it in the interests of justice to do so, the Court directed Pazarin to respond to Armes's Motion by April 16, 2007. The Court further reset the trial date to allow adequate time for Armes to reply and the Court to consider the Parties' arguments. Pazarin's counsel subsequently requested an enlargement of time until April 27, 2007, which the Court granted. Pazarin then electronically filed her Response on April 27, 2007. However, apparently due to technical difficulties, she was unable to electronically file her supporting exhibits. Pazarin rectified the deficiency by hand-filing her exhibits with the Clerk of the Court on April 30, 2007, and serving them on Armes the same day. The Parties agreed that Armes's time for filing a reply should be calculated based on service of the exhibits on April 30, 2007. See Def.'s Notice Of Agreed, Unopp. Deadline in which Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. is Due to be Filed, Rec. No. 51.

2. See supra text accompanying note 1.

3. The Parties dispute whether, before she engaged his services, Armes informed Pazarin either orally or in writing that he considered the $100,000 to be non-refundable.

4. As discussed immediately hereafter in the Court's Memorandum Opinion, Pazarin raises three claims for relief in her Complaint: (1) her right to restitution under the common law doctrine of unjust enrichment; and (2) two claims based on alleged violations of Texas's Deceptive Trade Practices Act ("DTPA"), which is codified in Title 2, Chapter 17, of the Texas Business and Commerce Code. Pazarin originally appeared to assert that she would be entitled to "exemplary damages" if she were to establish Armes's liability under an unjust enrichment theory. Pazarin now concedes "there is no authority for exemplary damages under a common law claim for unjust enrichment." Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, at p. 7, ¶ 11. Pazarin clarifies that she seeks "exemplary damages" only regarding her claims alleging a violation of Texas Business and Commerce Code sections 17.46(b)(24) and 17.50(a)(3), pursuant to Texas Business and Commerce Code section 17.50(b). See Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, at pp. 7–8, ¶ 11. However, as Armes correctly notes, section 17.50(b) does not authorize "exemplary damages." See TEX. BUS. & COM. CODE § 17.50(b). Presumably, by "exemplary damages," Pazarin refers to the treble damages which section 17.50(b)(1) makes available in certain circumstances. See TEX. BUS. & COM.CODE § 17.50(b)(1).

5. Pazarin is a citizen of the State of California. Armes is a citizen of the State of Texas. Because the amount in controversy exceeds $75,000 and the Parties' citizenship is completely diverse, this Court has jurisdiction over Pazarin's claims pursuant to 28 U.S.C. § 1332(a)(1). See 28 U.S.C. § 1332(a)(1) (setting forth the requirements for federal diversity jurisdiction).

■ Pazarin first claims she is entitled to $100,000 restitution under a common law unjust enrichment theory of liability.[6] Pazarin contends her agreement with Armes was purely verbal and that they never discussed what was to happen regarding the $100,000 should either side choose to end their association. Pazarin therefore asks the Court to find a quasi-contract existed between the Parties, providing for a refund of any unused or unearned portion of the $100,000 sum. Pazarin further asks the Court to find Armes breached this implied contract when he refused to return any unused or unearned portion of the $100,000 upon Pazarin's terminating his services.

Pazarin additionally alleges Armes violated Texas Business and Commerce Code sections 17.46(b)(24)[7] and 17.50(a)(3), which are subdivisions of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA").[8] Specifically, Pazarin argues Armes violated DTPA section 17.46(b)(24) because Armes did not inform Pazarin that he "intended to retain all sums paid to him without regard to whether his services were actually performed. Such information was material and the failure to disclose such information created a deception on which [Pazarin] relied to her detriment."[9] Pazarin asserts Armes also violated DTPA section 17.50(a)(3) when he refused to return the $100,000 to her. Pazarin avers that Armes's refusal constituted "an unconscionable act" under section 17.50(a)(3) because Armes allegedly took advantage of Pazarin's "lack of knowledge, ability, or experience" which resulted "in an exorbitant charge for the services rendered" and a "gross disparity between the value received and consideration paid."[10]

Armes moves for summary judgment regarding Pazarin's causes of action, insisting there is no evidence supporting the essential elements of her claims. Armes also argues that Texas Business and Commerce Code section 17.49(c), which exempts professional services from the DTPA's ambit, precludes Pazarin's DTPA claims.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 ("Rule 56") governs motions for summary judgment.[11] The purpose of Rule 56 is to

---

**6.** Under the *Erie* doctrine, a federal court sitting in diversity applies the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary. *Salve Regina College v. Russell*, 499 U.S. 225, 226, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). As no such federal statutory or constitutional directive exists in this instance, the Court will apply Texas law to Pazarin's unjust enrichment claim.

**7.** In her Complaint, Pazarin literally alleges a violation of Texas Business and Commerce Code section 17.46(b)(23) rather than section 17.46(b)(24). In her Response, however, Pazarin clarifies that she intended to allege a violation of section 17.46(b)(24). *See* Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, at ¶¶ I.3.b. & II.7. Because Pazarin's argument associated with this claim clearly invokes section 17.46(b)(24)'s language, the Court finds that, despite Pazarin's mislabeling, her Complaint sufficiently placed Armes on notice regarding the substance of her first DTPA claim. Further, through his Motion, Armes demonstrates his awareness of the mislabeling and the actual nature of Pazarin's first DPTA claim. *See* Def.'s Mot. for Summ. J., Rec. No. 36, at pp. 14–16, ¶¶ 24 & 25. The Court finds Pazarin's error in this regard resulted in no prejudice to Armes.

**8.** *See* TEX. BUS. & COM.CODE §§ 17.41–17.63.

**9.** Pl.'s Compl., Rec. No. 1, at ¶ 12.

**10.** Pl.'s Compl., Rec. No. 1, at ¶ 13.

**11.** *See* FED.R.CIV.P. 56.

"enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues." [12] Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [13] Under Rule 56(c) "judgment ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [14]

The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but it need not negate the elements of the non-movant's case.[15] Since the moving party bears the burden of proof, the Court construes the evidence in the opponent's favor and extends him the benefit of all favorable inferences.[16] When the moving party has properly supported his summary judgment motion, the non-moving party must come forward with "significant probative evidence" showing that there is an issue regarding material facts.[17] The non-movant may not simply rely on "vague assertions that additional discovery will produce needed, but unspecified facts." [18] If the non-movant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof at trial, then a grant of summary judgment is appropriate.[19] Even if the non-movant presents evidence to support his allegations, summary judgment will still be appropriate "unless there is sufficient evidence favoring the nonmoving [sic] party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." [20]

With these principles in mind, the Court turns to the evidence before it.

**12.** *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

**13.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**14.** FED.R.CIV.P. 56(c); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (noting that, under Rule 56(c), summary judgment is appropriate where it appears from the pleadings, depositions, admissions, and affidavits, that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law).

**15.** *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

**16.** *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

**17.** *Ferguson v. Natl. Broad. Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978).

**18.** *S.E.C. v. Spence & Green,* 612 F.2d 896 (5th Cir.1980); *see also Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 ("Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing that there is a genuine issue for trial."); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

**19.** *Celotex,* 477 U.S. 317, 321–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**20.** *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. THE EVIDENCE BEFORE THE COURT

### A. Evidence Offered By the Parties

Armes offers the following evidence to support his Motion. First, Armes provides his own Affidavit ("Defendant's Exhibit A"), dated January 26, 2007. Therein, Armes refers to and attaches copies of two documents: (1) a "Statement," dated November 16, 2005, and addressed to Pazarin, which purports to recount her payments as of that date and balance due to Armes's company ("Defendant's Exhibit A–1"); and (2) a signed "Employment Contract," dated November 16, 2005, allegedly executed between Pazarin and Armes ("Defendant's Exhibit A–2"). Second, Armes offers Pazarin's deposition testimony ("Defendant's Exhibit B"), as well as his own deposition testimony ("Defendant's Exhibit C"). Attached to Armes's deposition testimony is an exhibit consisting of notes Armes states he took during a November 16, 2005, in-person meeting with Pazarin ("Defendant's Exhibit C–1"). Third, Armes presents the deposition testimony of Pazarin's son, Omar Pazarin ("Defendant's Exhibit D").

To defeat Armes's Motion, Pazarin offers a page from Armes's web site discussing how his company, "The Investigators," determines the fee it charges for a particular case, together with a portion of Armes's deposition testimony ("Plaintiff's Exhibit A"). Pazarin additionally offers her own Affidavit (Plaintiff's Exhibit B), signed and dated April 26, 2007.[21] Therein, among other things, Pazarin disputes the authenticity of the Statement and Employment Contract Armes offers in support of his Motion, denying that the signa-ture affixed to each document is actually hers or that Armes ever presented these documents to her to read or sign.[22] Pazarin further offers "Defendant's Objections, Assertions of Privilege and Responses to Plaintiff's First Set of Requests for Production" ("Plaintiff's Exhibit C") to show Armes did not produce the Statement or Employment Contract until June 27, 2006, after the discovery deadline set by the Court had expired. Pazarin presents her own copies of the produced Statement and Employment Contract as "[Plaintiff's] Exhibit D." Pazarin also directs the Court's attention to a second portion of Armes's deposition testimony, labeled "[Plaintiff's] Exhibit E." Lastly, Pazarin presents an excerpt of a log detailing incoming and outgoing telephone calls on November 16, 2005, and November 17, 2005, for telephone number 619–227–2588 ("Plaintiff's Exhibit F"). The document lists the name of the account holder as "Adrienne Pazarin."

### B. Armes's Objections to Pazarin's Affidavit

Through his Reply, Armes objects to Pazarin's Affidavit, arguing it is a "sham." That is, Armes contends several of the assertions contained in Pazarin's Affidavit directly contradict her earlier deposition testimony and represent an impermissible effort to fabricate an issue of material fact where none exists, in order to survive Armes's Motion. Armes therefore urges the Court to strike five specific statements from Pazarin's Affidavit.

#### 1. Pazarin's Affidavit

To provide proper context, the Court sets forth the body of Pazarin's Affidavit verbatim, italicizing the statements to which Armes objects.[23]

---

21. The Court sets forth the body of Pazarin's Affidavit in Part III.B., *ante,* of this Memorandum Opinion.

22. *See supra* text accompanying note 21; *see also ante* Part III.B.

23. For consistency and to avoid confusion, the Court will refer to the objected-to statements using Armes's numbering, although Armes's numbering is non-sequential.

### Affidavit of Elizabeth Pazarin

My name is Elizabeth Pazarin and I am the plaintiff in the above referenced case. I am competent to make this affidavit and over the age of 18.

I contacted Jay J. Armes because my brother in law was kidnapped in Tijuana, Mexico. I have never hired an investigator before but my uncle suggested I call Mr. Armes. Mr. Armes did not charge for his initial consultation and asked me to meet with him and to bring a check for $100,000 in the event that I decided to hire him. I flew to El Paso on November 16, 2005[,] and went to Mr. Armes [sic] office on Montana Ave [sic] in El Paso. I discussed the case with him for about 2½ hours. Mr. Armes never told me that his retainer was not refundable. During the meeting I was never asked to sign any contract and I was never offered a contract to sign. I have seen the contract produced by Mr. Armes and it does not have my signature on it. There is a signature that looks like an "O" but I have never signed with an "O." The contract that Mr. Armes claims that I signed has a paragraph in it that says that his fee is not refundable. Had I been presented with that information I would not have paid Mr. Armes. Mr. Armes never mentioned anything about a $35,000 expenses charge over and above the $100,000. I did not hear about that until after this lawsuit was filed. I never provided Mr. Armes with any information regarding the experts from Mexico City who were working on the kidnapping so he would have no way to contact them or transmit any information that he had about the kidnap victim. *Mr. Armes takes credit for many things he that he did not do.* ["**Statement No. 1**"] During the initial meeting Armes asked me if Juan Pazarin, the kidnapping victim[,] was involved in any crime. I told him that the only thing

that I could think of was that it could be possible that he has sold pirated CD's [sic]. Armes imagined, then insisted[,] that Juan Pazarin was involved in the sale of illegal narcotics but I explained that was not the case. Armes claims that I wanted to pay him in cash. I never offered cash. In fact, I withdrew $70,000 of Mr. Armes [sic] fee from my account at Wells Fargo when I arrived in El Paso. Mr. Armes spent most of the time during our first meeting telling me how talented he was and how many cases he had handled. It was a sales pitch from beginning to end.

After our meeting I left Mr. Armes [sic] office and went directly to the airport to fly home. I called Mr. Armes about 4 hours after leaving his office to tell him that we would not need his services. He insisted that I postpone the decision until I had, "slept on it." I was perfectly clear that I did not want Mr. Armes to do any further work. He did not mention that he intended to keep the entire retainer. The next morning, November 16, 2005[,] I called Armes again to tell him that we did not want his services. Again he told me not to be so hasty and to think about it because he was simply the best in the world and the only person qualified to handle the case. I did not agree and he did not tell me he intended to keep the entire $100,000. I called back shortly thereafter to confirm that I did not want him to continue on my case. Armes then asked me, "Are you firing me?" I told him that it wasn't that, we just didn't need his services anymore. Then Mr. Armes stated that if I was to discharge him that I had to use the exact words—firing. So I used the word fired. *Then Mr. Armes said, "then, in that case, the retainer is not refundable."* ["**Statement No. 3**"] He then hung up the phone. *Thereafter he continued to do things, like call my*

son about the cell phones—*without my authorization.* ["**Statement No. 4**"] *Armes did no work of any value during the four hour period from the time I left his office until I called and cancelled.* ["**Statement No. 2**"] On November 16 when I called him at about midnight and told him that I no longer needed his services *he claimed that he already had "operatives" at the gymnasium in Tijuana owned by my brother in law. That would not be possible* ["**Statement No. 5**"] because I did not give him the location of the gymnasium. I could not have because I knew how to get to it but I did not have or know the address.

The $100,000 retainer is more than all of my life savings. If I would of [sic] known that my entire life savings was not refundable I would of not [sic] been induced into hiring Armes. I did have savings of $70,000 but I had to borrow

some of the money to pay Armes [sic] retainer.

/s/ Elizabeth Pazarin [24]

**2. Armes's Objections**

Armes moves to strike Statement Nos. 1, 2, and 5 (i.e., "Mr. Armes takes credit for many things he that he did not do," "Armes did no work of any value during the four hour period from the time I left his office until I called and cancelled," and "he claimed that he already had 'operatives' at the gymnasium in Tijuana owned by my brother in law. That would not be possible ...," respectively) on the basis that the statements contradict Pazarin's earlier deposition testimony.[25] Alternatively, Armes argues the Court should strike the aforementioned statements because they are speculative and made without basis, personal knowledge, or foundation.[26] Regarding Statement Nos. 3 and 4

---

**24.** Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, Ex. B (E. Pazarin Aff.).

**25.** Armes directs the Court's attention to a portion of Pazarin's August 17, 2006, deposition testimony wherein Pazarin testified she did not know what efforts Armes made to secure Juan Pazarin's release between the time she left Armes's office and returned to California:

Q. Okay, so you get a phone call from Jay Armes, and he tells you about GPS and Nextel; right?
A. Right.
Q. Okay. Do you know what else Mr. Armes was doing at this time, from the time you left his office until you got back to California? Do you know what efforts were made on your behalf to secure the release of Juan Manuel?
A. Not at that point, no.

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 104–05. Regarding Pazarin's assertion in Statement No. 2 that "Armes did no work of any value during the four hour period from the time I left his office until I called and cancelled," Armes argues Statement No. 2 directly contradicts Pazarin's following deposition testimony:
A. Tell me the question again.

Q. You're flying from El Paso to Phoenix. You get to Phoenix; right?
A. Uh-huh.
Q. And Jay Armes calls you to talk about the GPS and Nextel; right?
A. Uh-huh.
Q. And to give you instructions on that; right?
A. Yes.

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 112.

**26.** In addition to the portion of Pazarin's deposition testimony set forth in note 25, *supra*, of this Memorandum Opinion, Armes notes Pazarin's following deposition testimony concerning her lack of knowledge regarding Armes's investigative resources:

Q. Ms. Pazarin, do you know what kind of investigative resources Mr. Armes has to locate people and addresses?
A. I do not.

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 116; *see also supra* text accompanying note 25.

(i.e., Then Mr. Armes said, "[t]hen, in that case, the retainer is not refundable," and "[t]hereafter he continued to do things, like call my son about the cell phones— without my authorization," respectively), Armes asserts these statements also flatly contradict Pazarin's earlier deposition testimony.[27]

### 3. Discussion

▮ Rule 56(c) permits parties to submit affidavits in support of or opposition to a motion for summary judgment.[28]

**27.** In her August 17, 2006, deposition, Pazarin testified she did not call Armes to cancel his services until approximately midnight, Pacific Time, on November 17, 2005:

A. When I got back—when I did arrive in San Diego, my husband told me, "You need to call J.J. [sic] Armes.["] That was like around almost 11:30 p.m. San Diego time.

Q. Okay. That was on the evening of November 16; right?

A. Yes.

Q. And your husband met you at the airport?

A. Yes.

Q. Okay. And he said, "You have to call J.J. [sic] Armes" [sic]?

A. Yes.

. . .

Q. Okay. So what did you do?

A. I went from the San Diego airport to Denny's because I was hungry. The whole day I had been traveling and not eating. So I went to Denny's, and from Denny's I called Mr. J.J. [sic] Armes to cancel.

Q. Okay. And what time was that?

A. It had to be almost midnight.

Q. Were you able to get ahold of him?

A. Yes.

Q. And what did you tell him?

A. I said I wanted to cancel his services.

. . .

Q. Okay. So what happened after that? I mean you're telling me that you called to cancel his services; correct?

A. Yes.

Q. And did you have any other communication with him?

A. With who?

Q. With Mr. Armes.

A. Well, we talked, and he didn't want to, you know, cancel. And I said really, you know, we talked for a while. He said, "Sleep on it. Call me tomorrow because I know you're not thinking straight, and your relatives are not thinking straight. You're putting your brother-in-law in danger because time is very critical." And I said—I mean he didn't want to cancel at that time.

Q. Were you informed that that [sic] fee was not reimbursable?

A. Never.

Q. That was never told you [sic]?

A. No. We never talked about that.

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 105–08 (emphasis added); *see supra* text accompanying note 25 (setting forth Pazarin's communications, while on layover in Phoenix en route to San Diego, with Armes regarding activating the global positioning feature of Juan Pazarin's Nextel cellular telephone). Contrary to her affidavit statements, Pazarin's deposition testimony asserts that Armes, implicitly with Pazarin's authorization and assistance, arranged for the global positioning feature on Juan Pazarin's cellular telephone to be activated before Pazarin first began to discuss terminating Armes's service at approximately midnight on November 17, 2005. *See supra* text accompanying note 25.

Regarding Statement No. 4, in which Pazarin asserts Armes continued to communicate with Pazarin's family members about activating the global positioning feature of Juan Pazarin's cellular telephone after Pazarin terminated Armes's services, Armes highlights Pazarin's following deposition testimony:

Q. Okay. Now, was that the last conversation you had with Mr. Armes?

A. Yes.

Q. You never had any further communication with him at all?

A. Never.

Q. Do you know if Dr. Pasarin had any further communication with Mr. Armes?

A. . Never.

Q. Or Martha Leticia?

A. No.

Q... Or any—your husband or anyone from your family?

A. No.

Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 116.

**28.** FED.R.CIV.P. 56(c); *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548

Nonetheless, the non-moving party cannot use an affidavit that is clearly a "sham" to defeat a motion for summary judgment.[29] "Although the court must resolve all factual inferences in favor of the non-movant, the non-movant cannot manufacture a disputed material fact where none exists. Thus, the non-movant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony."[30] However, a court should not categorically reject an affidavit offered by the non-moving party in response to a motion for summary judgment where the offered affidavit contains merely minor discrepancies.[31]

The Court has carefully compared the contested statements in Pazarin's Affidavit with her earlier deposition testimony. After such review, the Court finds that the disputed assertions in Pazarin's Affidavit sufficiently contradict her deposition testimony, without explanation, to warrant striking them from the summary judgment record as unreliable. The Court accordingly **STRIKES** Affidavit Statement Nos. 1–5 from the record in this cause.

Having ruled on Armes's objections, the Court turns to the competent summary judgment evidence before it.

## C. The Undisputed Evidence Before the Court

After review, the Court finds the following facts are undisputed, except where specifically noted:

1. Armes is a Private Investigator licensed as an Officer/Manager/Private Investigator by the Texas Private Security Board, Texas Commission on Private Security, Texas Department of Public Safety.[32] Armes obtained his license in approximately 1958.[33]

2. For the last thirty years, Armes has owned and operated The Investigators, a private investigations company and security services contractor located in El Paso, Texas.[34] Armes also resides in El Paso.[35]

3. In his business as a Private Investigator, Armes investigates matters involving homicides, kidnappings, hostage recovery, and missing persons.[36] Armes specializes in high-

---

**29.** *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir.1980).

**30.** *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir.1984) (internal citation omitted); *see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (collecting cases in which, "with virtual unanimity," the circuit courts have held that a party cannot create a genuine issue of material fact sufficient to summary judgment by simply later submitting an affidavit that contradicts the party's earlier sworn deposition); *Copeland v. Wasserstein, Perella & Co. Inc.*, 278 F.3d 472, 482 (5th Cir.2002) ("[U]nder the federal rules, when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required explanation of that conflict. This jurisprudential rule has evolved from cases in which opposing parties had provided the affi-

davit and the deposition, but it applies equally to situations such as this, when the affidavit contradicts prior sworn testimony by the affiant himself.").

**31.** *Kennett–Murray Corp.*, 622 F.2d at 894.

**32.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 2; Ex. C (Armes Depo.) at 4.

**33.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 2; Ex. C (Armes Depo.) at 4.

**34.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 3.

**35.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 2.

**36.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 3.

risk, high-profile cases.[37]

4. Pazarin resided in Chula Vista, California at all times relevant to this lawsuit.[38]

5. On November 11, 2005, Pazarin learned that her brother-in-law, Juan Pazarin, had been kidnapped in Tijuana, Mexico.[39]

6. There are many kidnappings in Tijuana.[40]

7. Between November 11, 2005, and November 15, 2005, Pazarin called her uncle, Alfredo Tovar, about the kidnapping.[41] Tovar resided in El Paso, Texas, at all times relevant to Pazarin's lawsuit.[42] Tovar suggested that Pazarin call Armes.[43]

8. Pazarin telephoned Armes on November 15, 2005, between 7:00 and 8:00 p.m., Pacific Time.[44] This telephone call represented Pazarin's first contact with Armes.[45]

9. Armes spoke only with Pazarin during the November 15, 2005, telephone call.[46] There is no evidence before the Court regarding the November 15, 2005, telephone call's length.[47]

10. During the November 15, 2005, telephone conversation, Pazarin informed Armes about Juan Pazarin's kidnapping.[48] Pazarin did not ask Armes about his experience working with kidnapping cases, because she already knew that Armes handled kidnapping cases.[49] In response to the news of Juan Pazarin's kidnapping, however, Armes volunteered his experience with kidnapping cases.[50]

11. During the November 15, 2005, telephone conversation, Armes told Pazarin that he would charge her $100,000 to hire his services.[51]

37. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 3.

38. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at 74.

39. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 37–38.

40. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 11; Ex. B (E. Pazarin Depo.) at 40–41.

41. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 76.

42. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 89.

43. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 76.

44. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at 74.

45. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at 74.

46. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at 75; Ex. C (Armes Depo.) at 18.

47. Pazarin stated she could not remember how long her first conversation with Armes lasted. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 76.

48. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at 75.

49. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 76. "I knew since I was a small kid that he did this kind of work. . . . I know that he's been in this line of work for many years." Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 76.

50. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 75–76.

51. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at

Armes additionally told Pazarin that, if she wanted to hire him, she would need to personally appear in his El Paso office and tender payment of the $100,000 in the form of certified funds or a cashier's check.[52]

12. On November 15, 2005, after speaking with Pazarin and in anticipation of Pazarin's hiring his services, Armes began formulating an investigative plan of action to determine Juan Pazarin's specific whereabouts in Tijuana.[53] To that end, Armes determined what questions he should ask Pazarin and her family members.[54] Armes also telephoned a colleague living and working in the San Diego, California area, whom he identifies as "Operative A," to enlist Operative A's professional services.[55]

13. On November 16, 2005, Pazarin traveled to El Paso, leaving California at approximately 10:50 a.m., Pacific Time, and arriving in El Paso around 1 p.m., Mountain Time.[56] She had a layover in Phoenix, Arizona.[57]

14. Because the kidnappers used Juan Pazarin's Nextel cellular telephone to make their $2,000,000 ransom demand, Armes called Pazarin during her layover in Phoenix en route to El Paso.[58] Armes asked Pazarin to arrange for Nextel to activate the telephone's global positioning feature.[59] Activating the global positioning feature was Armes's idea.[60]

15. While still in Phoenix, Pazarin, per Armes's instructions, told her son, Steven Pazarin, to have Nextel activate the global positioning feature of Juan Pazarin's cellular telephone.[61] Steven Pazarin then called Omar Pazarin, his brother and the official account holder for Juan Pazarin's cellular telephone.[62] Steven directed Omar to call Nextel and have the company activate the telephone's global positioning feature.[63]

16. Before Pazarin arrived in El Paso, Armes also called Omar Pazarin.[64]

**52.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4; Ex. B (E. Pazarin Depo.) at

**53.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4.

**54.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4.

**55.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 4.

**56.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 87–89.

**57.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 112.

**58.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 112.

**59.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. B (E. Pazarin Depo.) at 88; Ex. D (O. Pazarin Depo.) at 32–37.

**60.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. B (E. Pazarin Depo.) at 102–04; Ex. D (O. Pazarin Depo.) at 62–64.

**61.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 102; Ex. D (O. Pazarin Depo.) at 32–33.

**62.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 102; Ex. D (O. Pazarin Depo.) at 32–33.

**63.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 102; Ex. D (O. Pazarin Depo.) at 32–33.

**64.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. D (O. Pazarin Depo.) at 61 & 119.

Armes and Omar Pazarin discussed activating the global positioning feature of Juan Pazarin's Nextel cellular telephone.[65] When Omar Pazarin received geographical coordinates from Nextel, he communicated them to Steven Pazarin.[66]

17. When Pazarin arrived in El Paso on November 16, 2005, she telephoned Armes to inform him of her arrival and that she would go to his office once she procured a cashier's check for $100,000.[67]

18. After Pazarin obtained a cashier's check for $100,000 at a local branch of her bank, Pazarin's uncle drove her to Armes's office.[68]

19. When Pazarin arrived at Armes's office, Pazarin gave Armes the cashier's check for $100,000.[69]

20. Pazarin and Armes met at Armes's office on November 16, 2005, and discussed Juan Pazarin's kidnapping for at least two-and-a-half to three hours.[70]

21. Over the course of his November 16, 2005, in-person meeting with Pazarin, Armes and his son, Jay Armes, took four pages of handwritten notes concerning Juan Pazarin's case.[71]

22. During the November 16, 2005, meeting, Armes had Pazarin telephone Juan Pazarin's wife, Martha Leticia Ruiz de Pazarin ("Mrs. Pazarin").[72] Mrs. Pazarin spoke to Armes via speaker phone.[73]

23. Armes asked Mrs. Pazarin whether her husband were having an affair and if she were involved in her husband's disappearance.[74] Armes also asked Mrs. Pazarin if the couple's most valuable asset, a gymnasium building in Tijuana with an estimated value of $2,000,000, were titled in her name or her husband's.[75] After learning the family suspected Juan Pazarin's employee, Humberto Sosa, and an individual called "Huicho" were likely involved in the kidnapping, Armes

65. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. D (O. Pazarin Depo.) at 61–64.

66. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. D (O. Pazarin Depo.) at 37.

67. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 89.

68. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 90.

69. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 5; Ex. B (E. Pazarin Depo.) at 92.

70. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 3 (stating that Armes and Pazarin met in person on November 16, 2005 for "approximately over [sic] four hours"); Ex. B (E. Pazarin Depo.) at 92 (stating that Pazarin met with Armes in person on November 16, 2005 for approximately three hours); Ex. C. (Armes Depo.) at 47 (stating that Armes and Pazarin met in person for seven to eight hours on November 16, 2005); Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, Ex. B (E. Pazarin Aff.) at ¶ 2 (stating Pazarin and Armes discussed the case for "about 2½ hours.").

71. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 19–26; Ex. B (E. Pazarin Depo.) at 93; Ex. C–1 (Notes of Armes's Nov. 16, 2005, meeting with Pazarin).

72. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. B (E. Pazarin Depo.) at 94–96.

73. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 95.

74. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 95.

75. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 95.

asked Mrs. Pazarin about the men and her husband's relationship to them.[76] Armes asked Mrs. Pazarin whether her husband had any enemies.[77] Armes obtained Mrs. Pazarin's telephone number and asked about what kind of telephone service her husband had.[78] Armes advised Mrs. Pazarin to remove herself and her children from Tijuana to San Diego, California, which Mrs. Pazarin did.[79]

24. During the November 16, 2005, meeting, Armes also had Pazarin call Dr. Jose Luis Pasarin, Juan Pazarin's brother.[80] Armes's conversation with Dr. Pasarin took place via speaker phone.[81]

25. During the November 16, 2005, meeting, Armes established: (a) who was hiring him;[82] (b) Pazarin's contact information in California;[83] (c) Juan Pazarin's age and physical characteristics;[84] (d) the number, gender, and ages of Juan Pazarin's children;[85] (e) the number, make, models, and license plate numbers of Juan Pazarin's automobiles;[86] (f) Juan Pazarin's movements and activities immediately before the kidnapping;[87] (g) what the kidnappers communicated during the initial ransom call to Juan Pazarin's wife, including the $2,000,000 ransom demand;[88] (h) what the kidnappers said in a follow-up call to Juan Pazarin's brother, Dr. Jose Luis Pasarin;[89] (i) that Humberto Sosa and an individual called "Huicho" were likely involved in the kidnapping;[90] (j) Sosa and Huicho's physical characteristics and relationship to Juan Pazarin;[91] (k) telephone numbers for Juan Pazarin's various relatives; and (l) that Juan Pazarin was not involved in narcotics trafficking, but was possibly involved in pirating DVDs.[92]

76. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 95–96.

77. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 96.

78. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 96.

79. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 110–11.

80. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 97. Pazarin testified that Jose Luis Pasarin spells his surname with an "s" rather than a "z." Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 80.

81. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 97.

82. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 18–19.

83. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 19.

84. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 20.

85. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 21.

86. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 21.

87. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 21.

88. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 93–94; Ex. C. (Armes Depo.) at 21 & 23.

89. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. C. (Armes Depo.) at 23–24.

90. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 92; Ex. C. (Armes Depo.) at 23–24.

91. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 92; Ex. C. (Armes Depo.) at 23–24.

92. Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 92; Ex. C. (Armes Depo.) at 24–25; Pl.'s Resp. to Def.'s Mot. for

26. Between November 15, 2005, and 11:30 a.m. on November 17, 2005, Armes arranged for surveillance of Juan Pazarin's gymnasium building in Tijuana.[93]

27. At approximately midnight on November 17, 2005, Pazarin telephoned Armes in El Paso.[94] Her goal was to terminate Armes's services because she and her family had decided to engage the services of Mexican investigators or negotiators, but the Parties dispute the state of their professional relationship at the end of their telephone conversation.[95]

28. Pazarin placed another call to Armes at approximately 9:30 a.m., Pacific Time, on November 17, 2005.[96] Her goal was to terminate Armes's services because she and her family had decided to engage the services of Mexican investigators or negotiators, but the Parties dispute the state of their professional relationship at the end of their telephone conversation.[97]

29. Pazarin terminated Armes's services no later than November 17, 2005, in a telephone call placed at approximately 11:30 a.m., Pacific Time.[98] Pazarin terminated Armes's services because she and her family had decided to engage the services of Mexican investigators or negotiators.[99] Pazarin did not request a refund at that time.[100]

30. During the 11:30 a.m. conversation on November 17, 2005, Armes told Pazarin that his agents were presently conducting surveillance of Juan Pazarin's gymnasium building in Tijuana.[101]

31. Juan Pazarin's captors released him on December 12, 2005.[102]

32. Pazarin does not know how private investigators charge in foreign kidnapping cases.[103]

33. Armes based his $100,000 fee on many factors, including: (a) his extensive and highly-specialized training, education, work experience, and investigative skills; (b) unique

Summ. J., Rec. No. 49, Ex. B (E. Pazarin Aff.) at ¶ 2.

**93.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 6; Ex. B (E. Pazarin Depo.) at 115.

**94.** Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 107.

**95.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 7; Ex. B (E. Pazarin Depo.) at 143; Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, Ex. B (E. Pazarin Aff.) at ¶ 3; Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 52, Ex. A (E. Pazarin Depo.) at 107.

**96.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 115; Pl.'s Resp. to Def.'s Mot. for Summ. J., Rec. No. 49, Ex. B (E. Pazarin Aff.) at ¶ 3.

**97.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 7; Ex. B (E. Pazarin Depo.) at 143.

**98.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 7; Ex. B (E. Pazarin Depo.) at 115.

**99.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 7; Ex. B (E. Pazarin Depo.) at 143.

**100.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. A (Armes Aff.) at ¶ 7.

**101.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 115.

**102.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 118.

**103.** Def.'s Mot. for Summ. J., Rec. No. 36, Ex. B (E. Pazarin Depo.) at 150.

knowledge derived from being a licensed private investigator for thirty years and engaging in hazardous foreign and domestic kidnapping investigations, including kidnappings occurring in Mexico; (c) the dangerous conditions he and his operatives would encounter in Tijuana; and (d) the danger he and his operatives would expose themselves to from Juan Pazarin's captors.

## IV. PAZARIN'S UNJUST ENRICHMENT CLAIM

Before reaching the merits of Armes's Motion, the Court considers the purpose and scope of the unjust enrichment doctrine.

### A. The Doctrine of Unjust Enrichment

■■■ The doctrine of unjust enrichment is an equitable remedy providing restitution to an aggrieved party through a legal fiction known as a "quasi-contract" or "contract implied-in-law." [104] The doctrine "applies restitution principles to disputes which for one reason or another are not governed by a contract between the contending parties." [105] "A party may recover under a theory of unjust enrichment when one party has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." [106] Nonetheless, restitution under an unjust enrichment theory "is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant, or because the benefits to the person sought to be charged amount to a windfall." [107] "The

**104.** See Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 683–84 (Tex.2000) (noting that a quasi-contract is not a contract at all but an obligation imposed by law to do justice even though it is clear no promise was ever made or intended); Ferrous Products Co. v. Gulf States Trading Co., 160 Tex. 399, 402–03, 332 S.W.2d 310 (Tex.1960) ("Contracts implied in law, or ... more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice, and which are allowed to be enforced by an action ex contractu [sic]. They rest solely on a legal fiction and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. Such contracts rest on the equitable principles that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatsoever it is certain that a man ought to do, that the law supposes him to have promised to do ....") (internal quotations omitted).

**105.** Burlington N. R.R. Co. v. Southwestern Elec. Power Co., 925 S.W.2d 92, 96 (Tex.App.-Texarkana 1996), aff'd, 966 S.W.2d 467 (Tex.

1998); see First Union Nat'l Bank N/K/A Wachovia Bank, N.A. v. Richmont Capital Partners I, L.P., 168 S.W.3d 917, 931 (Tex.App.-Dallas 2005 no pet.) (noting that the doctrine of unjust enrichment "applies the principles of restitution to disputes which are not governed by a contract between the contending parties" and that unjust enrichment claims "are predicated on the absence of an express contract controlling the circumstances."); Lone Star Steel Co. v. Scott, 759 S.W.2d 144, 154 (Tex.App.-Texarkana 1988 writ denied) ("Recovery on either unjust enrichment or quantum meruit [grounds] is recovery on a quasi-contract or a contract implied in law, and there can be no recovery on either [grounds] if the same subject is covered by an express contract."). "The purpose of restitution is to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant." Burlington N. R.R. Co., 925 S.W.2d at 97. Courts accomplish the goal of restitution by requiring the defendant to return any performance to which the defendant is not entitled to the plaintiff. Id.

**106.** Heldenfels Bros., Inc. v. Corpus Christi, 832 S.W.2d 39, 41 (Tex.1992).

**107.** Id. at 42 (internal quotation omitted).

doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." [108] "[W]hen a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory because parties should be bound by their express agreements." [109] In addition, the doctrine of unjust enrichment "does not apply when the contractual duty at issue has been performed." [110] "The effect of [ ] written contracts on claims for unjust enrichment is one of law." [111]

> When the existence of or the terms of a contract are in doubt, and there is a claim for unjust enrichment, it is incumbent upon the party disputing that claim to secure findings from the trial court that an express contract exists that covers the subject matter of the dispute. [112]

### B. Discussion

As a threshold issue, the Court notes Armes has come forward with documentary and testimonial evidence that Pazarin and Armes executed a contract which expressly stated that the $100,000 was non-refundable. Pazarin, however, challenges the purported contract's authenticity as well as Armes's testimony on this issue. The Court has examined Pazarin's purported signatures on the Employment Contract and Statement (Defendant's Exhibits A–1 and A–2) Armes offers in support of his Motion and compared them to the signature appearing on Pazarin's Affidavit filed on December 18, 2006 (before Armes filed his Motion), concerning a discovery dispute in this case. [113] Without commenting on the ultimate merits of Pazarin's allegations, the Court nevertheless observes there is an extreme discrepancy between the signatures appearing on the Employment Contract and Statement versus the signature appearing on Pazarin's Affidavit dated December 18, 2006. In the absence of further explanation, the discrepancy lends significant weight to Pazarin's assertion that she did not sign the Employment Contract and Statement.

Whether or not an express, valid contract existed governing the refundability of Armes's fee is a key issue in this case because a jury finding on this point in Armes's favor would preclude Pazarin's unjust enrichment claim as a matter of law. [114] The Court will assume for pur-

---

108. *First Union Nat'l Bank,* 168 S.W.3d at 931; *see Burlington N. R.R.,* 925 S.W.2d at 97.

109. *First Union Nat'l Bank,* 168 S.W.3d at 931; *see Fortune Production Co.,* 52 S.W.3d at 683 ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."); *Burlington N. R.R.,* 925 S.W.2d at 97 ("A remedy such as unjust enrichment that is based on quasi-contract or a contract implied in law is unavailable when a valid, express contract governing the subject matter of the dispute exists.").

110. *First Union Nat'l Bank,* 168 S.W.3d at 931 (citing *Burlington N. R.R.,* 925 S.W.2d at 97).

111. *Fortune Production Co.,* 52 S.W.3d at 683.

112. *Id.* at 685.

113. *See* Pl.'s Resp. to Def.'s Mot. to Compel Written Discovery from the Pl. and Mot. for Sanctions, Rec. No. 24, Ex. A (E. Pazarin Aff.).

114. *See First Union Nat'l Bank,* 168 S.W.3d at 931; *Fortune Production Co.,* 52 S.W.3d at 683; *Burlington Northern,* 925 S.W.2d at 97. The Court notes that, unlike attorneys, private investigators in the State of Texas are not expressly prohibited from making contracts which require the client to pay a non-refundable retainer. *See* 37 Tex. Admin. Code § 35.35 (Vernon's 2007) (stating certain standards of service licensed private investigators owe clients).

poses of argument, however, that a jury would resolve this question in Pazarin's favor. For Pazarin's unjust enrichment claim to ultimately survive Armes's Motion, Pazarin must nonetheless also produce evidence that Armes obtained the $100,000 from her through "fraud, duress, or the taking of an undue advantage." [115] Or, as Pazarin herself frames the issue, Pazarin must present evidence that Armes "received the benefit of $100,000.00 paid to him without providing professional services to the plaintiff in an amount which merits a payment of $100,000.00." [116] Furthermore, the evidence must sufficiently favor Pazarin such that a reasonable jury could return a jury verdict for her.[117] Merely colorable or not significantly probative evidence will not suffice.[118]

■ Here, evaluating the evidence before it in the light most favorable to Pazarin and extending her the benefit of all reasonable inferences,[119] the Court concludes a reasonable jury could find Armes failed to inform Pazarin that his fee was non-refundable, and in doing so, took undue advantage of her in obtaining the $100,000, to Pazarin's detriment. The Court will accordingly deny Armes's Motion regarding Pazarin's unjust enrichment claim.

## V. *PAZARIN'S DTPA CLAIMS*

Pazarin alleges Armes is liable for violating two provisions of the DTPA, specifically, Texas Business and Commerce Code sections 17.46(b)(24) [120] and 17.50(a)(3). Pazarin contends Armes violated section 17.46(b)(24) because he did not inform Pazarin that he intended to keep the $100,000 regardless of "whether his services were actually performed. Such information was material and the failure to disclose such information created a deception on which [Pazarin] relied to her detriment." [121] Pazarin also asserts Armes committed an unconscionable act when he refused to return the $100,000, giving rise to a cause of action under section 17.50(a)(3). In support of her unconscionability argument, Pazarin alleges Armes took advantage of Pazarin's "lack of knowledge, ability, or experience" which resulted "in an exorbitant charge for the services rendered" and a "gross disparity between the value received and consideration paid." [122]

Armes moves for summary judgment on the ground that Texas Business and Commerce Code section 17.49(c) exempts the rendition of professional services as a basis for DTPA causes of action. Thus, Armes argues section 17.49(c) bars Pazarin's DTPA claims against him. In the alternative, Armes contends there is no evidence to support a finding that Armes violated either section 17.46(b)(24) or section 17.50(a)(3). The Court evaluates each of Armes's arguments in turn.

### A. *The Effect of Section 17.49(c) on Pazarin's DTPA Claims*

■ Section 17.49(c) provides, in pertinent part:

(c) Nothing in this subchapter shall apply to a claim for damages based on the rendering of a professional service, the

---

115. See *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992).

116. Pl.'s Compl., Rec. No. 1, at ¶ 8.

117. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

118. *Id.*

119. See *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986).

120. *See supra* text accompanying note 7.

121. Pl.'s Compl., Rec. No. 1, at ¶ 12.

122. Pl.'s Compl., Rec. No. 1, at ¶ 13.

essence of which is the providing of advice, judgment, opinion, or similar professional skill. This exemption does not apply to:

    (1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;

    (2) failure to disclose information in violation of Section 17.46(b)(24);

    (3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion;

    (4) breach of an express warranty that cannot be characterized as advice, judgment, or opinion; or

    (5) a violation of Section 17.46(b)(26).[123]

It is clear that section 1749(c) precludes Pazarin's DTPA claims against Armes if those claims are based on Armes's rendition of "a professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill."[124] Based on Pazarin's pleadings,[125] the Court concludes her claims against Armes do not arise from the rendition of his professional services as an investigator. Put differently, it is clear Pazarin does not seek to hold Armes liable for giving her poor advice regarding how best to recover Juan Pazarin or for formulating a poor strategy or for mis-executing an otherwise viable strategy. If she did, section 1749(c)

would bar Pazarin's claims, as her claims would clearly implicate the exercise of Armes's professional skill and judgment.[126] Rather, Pazarin solely contends Armes improperly kept all of the $100,000 she paid him to recover Juan Pazarin. Although the Court is aware of no case law on this point to either support or undermine its conclusion, in the Court's view, Armes's decision to keep Pazarin's money falls outside the exercise of professional services. Rather, Armes's action represents a business or administrative decision which is sufficiently disconnected from the provision of "advice, judgment, opinion, or similar professional skill" to render section 17.49(c)'s exception regarding professional services inapplicable. Further, Pazarin's allegations in support of her DTPA claims charge Armes with "an express misrepresentation of material fact" (i.e., Armes's alleged failure to inform Pazarin that the $100,000 was non-refundable) and "an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion giving of professional advice" (i.e., Armes's refusal to return Pazarin's money). These allegations, if true, expressly render section 17.49(c)'s general exemption inapplicable.[127] For these reasons, the Court concludes that section 17.49(c) does not preclude Pazarin's DTPA claims.

---

**123.** Tex. Bus. & Com.Code § 17.49(c).

**124.** *Id.*

**125.** *See Reid,* 784 F.2d at 578.

**126.** *See* Tex. Bus. & Com.Code § 17.49(c).

**127.** *See* Tex. Bus & Com.Code § 17.49(c)(1)-(3) (permitting a consumer to maintain a cause of action for damages against a defendant who provides "professional services," where the cause of action arises from, among other things, an express material misrepresentation or unconscionable act which cannot be characterized as "advice, judgment, or opinion").

Section 17.49(c) is thus consistent with Chapter 37, section 35.34(n) if the Texas Administrative Code, which governs the conduct of private investigators and security companies. Section 35.34(n) expressly makes private investigators liable for false, misleading, or deceptive acts or practices, as those terms are defined in § 17.46 of the Texas Business and Commerce Code. *See* 37 Tex. Admin. Code § 35.34(n) ("No provider of a regulated activity or service shall engage in any unconscionable action or course of action, or engage in any false, misleading, or deceptive act or practice, *as these are defined in* §§ 17.45(5) and 17.46 (respectively) of the Texas Business and Commerce Code.").

The Court now considers the provisions of Texas Business and Commerce Code sections 17.46(b)(23) and 17.50(a)(3).

### B. Texas Business and Commerce Code Sections 17.46(b)(24) and 17.50(a)(3)

Texas Business and Commerce Code section 17.50(a)(1)(A) permits a consumer to maintain a private cause of action for damages where: (1) "the use or employment by any person of a false, misleading, or deceptive act or practice"—including those false, misleading, or deceptive acts or practices specifically enumerated in Texas Business and Commerce Code section 17.46—"constitute a producing cause of economic damages or damages for mental anguish;" and (2) the consumer relied on the false, misleading, or deceptive act or practice to his detriment.[128] Under section 17.46(b)(24), "false, misleading, or deceptive acts or practices" include "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."[129] Texas Business and Commerce Code section 17.50(a)(3) permits a consumer to maintain a separate cause of action where "any unconscionable action or course of action by any person" constitutes a "producing cause of economic damages or damages for mental anguish."[130]

### C. Discussion

Although the Court concludes section 17.49(c) does not bar Pazarin's DTPA claims, this determination does not end its inquiry. The Court must still resolve whether the undisputed evidence construed in Pazarin's favor and benefit of all favorable inferences are sufficient for Pazarin's DTPA claims to withstand Armes's motion for summary judgment.[131]

■ The Court first considers Pazarin's cause of action under section 17.24(b)(24). To the extent Pazarin claims Armes violated DTPA section 17.46(b)(24) by failing to disclose that he would not refund the $100,000 fee, the Court finds Pazarin has presented disputed issues of material fact that the jury must decide. The undisputed evidence is such that a reasonable jury could determine: (1) Armes did not inform Pazarin that he considered the $100,000 to be non-refundable; (2) Armes's failure to disclose such information was intended to induce Pazarin into engaging his investigative services; (3) Pazarin would not have retained Armes's investigative services had she known Armes considered his fee non-refundable; and (4) Pazarin sustained economic loss as a result of Armes's conduct. The Court will therefore deny Armes's Motion regarding Pazarin's claim under DTPA section 17.24(b)(24).

■ The Court reaches a similar conclusion concerning Pazarin's claim under DTPA section 17.50(a)(3). The Court concludes a reasonable jury could determine Armes did not inform Pazarin that he would not refund the $100,000 if she decided to terminate his services, and by refusing to return all or a portion of the $100,000, committed an "unconscionable" act. The Court will accordingly also deny Armes's Motion as to Pazarin's claim under DTPA section 17.50(a)(3).

### VI. CONCLUSION AND ORDER

For the reasons discussed above, the Court finds Defendant Jay J. Armes is not

---

**128.** TEX. BUS. & COM.CODE § 17.50(a)(1).

**129.** TEX. BUS. & COM.CODE § 17.46(b)(24).

**130.** TEX BUS. & COM.CODE § 17.50(a)(3).

**131.** See Reid, 784 F.2d at 578.

entitled to summary judgment regarding Plaintiff Elizabeth Pazarin's three claims against him. The Court accordingly enters the following orders:

1. The Court **DENIES** Defendant Jay J. Armes's Motion for Summary Judgment [Rec. No. 34], filed through counsel on January 26, 2007.

2. The Parties shall accordingly prepare for a jury trial in this matter, which is currently set for *1 p.m. on July 9, 2007* in Courtroom No. 4, Fourth Floor of the United States District Courthouse, 511 E. San Antonio Avenue, El Paso, Texas, 79901. The parties shall **FILE** their pretrial submissions in the form set out in Local Rule CV–16(e) no later than *June 29, 2007.*

**SO ORDERED.**