**TC DALLAS # 1, LP, Appellant,**

v.

**REPUBLIC UNDERWRITERS INSURANCE COMPANY, Appellee.**

**No. 05–08–00656–CV.**

Court of Appeals of Texas, Dallas.

July 21, 2010.

Rehearing Overruled Aug. 23, 2010.

Jeffrey S. Levinger, Hankinson Levinger LLP, Dallas, TX, for Appellant.

James H. Moody, III, Marcie L. Schout, Arthur F. Selander, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, TX, for Appellee.

Before Chief Justice WRIGHT and Justices MOSELEY and FRANCIS.

## OPINION

Opinion By Justice MOSELEY.

This case involves the interpretation of a purchase and sale agreement ("PSA") whereby TC Dallas #1, LP bought an office building from Republic Underwriters Insurance Company. TC Dallas sought a judgment declaring its rights under the PSA, specifically whether Republic was liable for a portion of certain expenses. The parties filed cross-motions for partial summary judgment. The trial court granted Republic's motion and denied TC Dallas's, effectively holding that Republic was not responsible for the expenses at issue. The trial court incorporated its summary judgment rulings into its final judgment and awarded attorney's fees to Republic. TC Dallas challenges the trial court's summary judgment rulings. (It also contends that, because the trial court erred by granting summary judgment in Republic's favor, Republic was not entitled to attorney's fees.) For the reasons set forth below, we resolve these issues against TC Dallas and affirm the trial court's judgment.

## I. FACTUAL BACKGROUND

The facts are undisputed. On August 31, 2004, TC Dallas and Republic entered into the PSA for the office building, in which the Dallas National Bank had been a tenant since 1996. TC Dallas intended to redevelop the property, but it could not do so until all the tenants, including the Bank, vacated the building. The purchase price was $20 million, but Republic agreed to share TC Dallas's expenses for terminating the leases of the remaining tenants and the costs of managing and operating the property until the last tenant vacated.

The above portion of their agreement was set forth in Section 8.7 of the PSA. Paragraph (a) of that provision included the following definitions:

(3) *"Lease Termination Costs"* shall mean all buy-out fees, termination fees and other consideration paid or given to tenants to terminate the Leases, including base rental credits and other inducements.

(4) *"Operating Expenses"* shall mean all expenses and disbursements that Purchaser [TC Dallas] incurs in connection with the ownership, operation, management and maintenance of the Property, determined in accordance with sound accounting principles consistently applied.

(5) *"O & T Expenses"* shall mean all Lease Termination Costs incurred by Purchaser [TC Dallas] from and after the Closing Date until the end of the Adjustment Period, (i) increased by Operating Expenses incurred during the Adjustment Period, [and] (ii) decreased by all base rent collected by Purchaser [TC Dallas] from tenants under their Leases ... during the Adjustment Period,....

Section 8.7(b) provided that, after closing, TC Dallas had the sole and exclusive right to negotiate the termination of the tenants' leases. Section 8.7(c) provided for the sharing of the O & T Expenses: TC Dallas was responsible for the first $1,400,000 of O & T Expenses, and the O & T Expenses thereafter would be paid sixty percent by TC Dallas and forty percent by Republic.

However, TC Dallas did not develop the property. Instead, about ten months later, it entered into a second PSA to sell the property to SCA 2727 Turtle Creek Limited Partnership (Turtle Creek Partnership) for $16 million.[1] The second PSA stated that the $16 million purchase price reflected a $6 million reduction from the "intended" purchase price. The agreement called this price reduction the "Bank Credit," which was defined as the amount by which the intended purchase price was reduced to compensate Turtle Creek Partnership for the risk involved in agreeing to accept title to the property subject to Dallas National Bank's lease, as well as "anticipated termination costs of terminating [the Bank's lease] and the incremental cost of operating [the property] as an occupied office building."

The second PSA stated that TC Dallas had ongoing contractual rights and obligations to Republic and stated that TC Dallas "hereby retains (and does not assign to Purchaser [Turtle Creek Partnership]) all of the rights and obligations under the [first PSA], including without limitation the rights and obligations under Section 8.7 thereof, subject to Purchaser's [Turtle Creek Partnership's] obligation to fund such costs as described below" and TC Dallas "shall have the sole right of reimbursement from [Republic] under Section 8.7 of the [first PSA]...." The second PSA then provided that Turtle Creek Partnership would have the exclusive right to negotiate any modification or termination of the Bank's lease. Any buy-out fees, termination fees, and other consideration paid or granted to Dallas National Bank in consideration of the termination or modification of its lease were defined as "Bank Lease Modification Costs." Turtle Creek Partnership would send TC Dallas a notice of the Bank Lease Modification Costs and wire transfer to TC Dallas the amount of the Bank Lease Modification

1. When signed in June 2005, the "Purchaser" under the second PSA was TCR South Central 2005, Inc. However, the second PSA permitted the Purchaser to assign its rights in the agreement. About one month after signing the second PSA, and before the closing date,

TCR South Central assigned its rights to Turtle Creek Partnership. All of the actions at issue in this case of the Purchaser under the second PSA were performed by Turtle Creek Partnership.

Costs. TC Dallas would pay those costs to the Bank's designated payee.

In December 2006, Turtle Creek Partnership and the Bank negotiated an amendment to the Bank's lease. The principal term of the lease was extended by one year, from April 2009 through April 2010, and the Bank released the right to renew the lease beyond that date. (Under a previous lease amendment, the Bank had the right to renew the lease through April 2014.)

As part of the consideration for the Bank's agreement to the amendment of the lease, Turtle Creek Partnership agreed to pay the Bank $2 million. Following the procedure in the second PSA for paying the Bank the consideration for modifying the lease, Turtle Creek Partnership wired the $2 million to TC Dallas, and TC Dallas then wired the $2 million to the Bank.

TC Dallas sued Republic seeking a declaration that Republic was liable for O & T Expenses, including all Lease Termination Costs relating to the Bank's tenancy, and asserting that Republic breached the first PSA by failing to reimburse TC Dallas for its share of these expenses. In their motions for partial summary judgment and responses, the parties presented the question whether Republic was obligated under section 8.7(c) of the first PSA to reimburse TC Dallas for forty percent of some portion of the $6 million Bank Credit. TC Dallas argued that based on the plain meaning of the terms defined in section 8.7(a), $2 million of the Bank Credit was Lease Termination Costs and thus constituted O & T Expenses and that some undetermined portion of the remaining $4 million of the Bank Credit was Operating Expenses and thus constituted O & T Expenses as well. Republic asserted in its motion for summary judgment that none of the Bank Credit constituted O & T Expenses and that Republic had no obligation to reimburse TC Dallas. The trial court granted Republic's motion and denied TC Dallas's motion, ruling expressly that the $2 million bank lease modification payment was not a Lease Termination Cost as defined in the first PSA and that the $6 million bank credit contained in the second PSA did not constitute an O & T Expense as defined in the first PSA.

## II. REIMBURSEMENT OF EXPENSES

In its first issue, TC Dallas challenges the granting of Republic's motion and the denial of its motion, contending the trial court erred by concluding that the $6 million bank credit did not constitute a reimbursable O & T Expense under the first PSA.

### A. Standard of Review

We review a summary judgment using the well-established standard. The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). In deciding whether a disputed material fact issue exists precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex.2006). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824–25 (Tex.2005). We review a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.*, 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied).

When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to

judgment as a matter of law. *Guynes v. Galveston County*, 861 S.W.2d 861, 862 (Tex.1993); *Howard v. INA County Mut. Ins. Co.*, 933 S.W.2d 212, 216 (Tex.App.-Dallas 1996, writ denied). Neither party can prevail because of the other's failure to discharge its burden. *Guynes*, 861 S.W.2d at 862; *Howard*, 933 S.W.2d at 216. When both parties move for summary judgment, we consider all the evidence accompanying both motions in determining whether to grant either party's motion. *Howard*, 933 S.W.2d at 216; *Benchmark Bank v. State Farm Lloyds*, 893 S.W.2d 649, 650 (Tex.App.-Dallas 1994, no writ). When the trial court grants one motion and denies the other, the reviewing court should determine all questions presented. *See Comm'rs Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex.1997). The reviewing court should render the judgment that the trial court should have rendered. *Id.*

**B. Applicable Law**

■ Under the Texas Uniform Declaratory Judgments Act, a party to a written contract may seek a judicial determination of its contractual rights. Tex. Civ. Prac. & Rem.Code § 37.004(a) (Vernon 2008); *Hartman v. Sirgo Operating, Inc.*, 863 S.W.2d 764, 767 (Tex.App.-El Paso 1993, writ denied). When a contract is unambiguous and the dispositive facts are not in dispute, a court may grant summary judgment and render a declaratory judgment regarding the parties' rights under the contract. *See, e.g., Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 131–32 (Tex.App.-Corpus Christi 2006, pet. denied) (granting summary judgment and rendering declaratory judgment regarding breach of unambiguous contract).

■ The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex.*

*Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). The court's primary concern in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). The parties' intent must be taken from the agreement, and the agreement must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P.*, 194 S.W.3d 723, 726 (Tex.App.-Dallas 2006, pet. denied). We favor an interpretation that affords some consequences to each part of the agreement so that none of the provisions will be rendered meaningless. *Coker*, 650 S.W.2d at 394. Unless the agreement shows that the parties used a term in a technical or different sense, we give the terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996).

**C. Discussion**

■ TC Dallas pleaded that the $6 million Bank Credit was an O & T Expense as defined under the first PSA to the extent the amount concerned the $2 million payment to the Bank for agreeing not to renew its lease after 2010, and for the operation and management expenses of the property after the signing of the second PSA.

Under the first PSA, Republic agreed to pay forty percent of the "O & T Expenses," defined as "all Lease Termination Costs *incurred by Purchaser* [TC Dallas] ... increased by Operating Expenses incurred...." (Emphasis added.) For payments to be "Lease Termination Costs," they had to be "buy-out fees, termination fees and other consideration paid or given to tenants to terminate the leases." For the payments to be "Operating Expenses" they had to be "expenses and disbursements that *Purchaser* [TC Dallas] *incurs*

*in connection with the ownership, operation, management and maintenance* of the Property." (Emphasis added.) Republic moved for summary judgment asserting the $6 million Bank Credit did not fall into either category.

The second PSA defined "Bank Credit" as follows:

> The amount ($6,000,000.00) by which the intended Purchase Price was reduced to compensate the Purchaser for the risk involved in agreeing to accept title to the Property subject to the Bank Lease, as well as anticipated termination costs of terminating the Bank Lease and the incremental cost of operating the Real Property as an occupied office building.

TC Dallas argues that some portion of the $6 million Bank Credit should be considered Operating Expenses under the first PSA because the discount constituted an "expense" or "disbursement" incurred by TC Dallas "in connection with the ownership, operation, management and maintenance of the property." We disagree.

First, according to the second PSA, the Bank Credit was a *discount* in the sales price of the property made by TC Dallas to Turtle Creek Partnership, not an expense or disbursement. This conclusion is not affected by the fact that its existence arose out of the respective desires of the contracting parties to allocate costs (or risks of costs) that might be incurred in the future. Second, the $6 million Bank Credit (i.e., the discount) was not incurred by TC Dallas "in connection with the ownership, operation, management and maintenance of the property." Rather, it was incurred by TC Dallas in connection with TC Dallas's sale of the property to Turtle Creek Partnership. And these conclusions are unaffected by the fact that the definition of "Bank Credit" makes clear that its purpose was to compensate Turtle Creek Partnership for the expenses it (not TC

Dallas) may incur in owning, managing, and operating the property while it was occupied. Accordingly, the $6 million Bank Credit, as such, does not constitute Lease Termination Costs or Operating Expenses as defined in the first PSA, and thus does not constitute "O & T" Expenses under that agreement.

■ TC Dallas also argues that the $2 million of the Bank Credit paid by Turtle Creek Partnership to the Bank—albeit via TC Dallas—should be considered Lease Termination Costs because the definition of "Bank Credit" in the second PSA stated it was for "anticipated costs of terminating the Bank Lease." However, the definition of "Bank Credit" makes clear the credit was compensation to the Purchaser, Turtle Creek Partnership, for the expenses that Turtle Creek Partnership, not TC Dallas, would incur in terminating the Bank's lease.

■ TC Dallas also argues that the $2 million of the Bank Credit paid by Turtle Creek Partnership to the Bank—albeit via TC Dallas—should be considered Lease Termination Costs as defined in the first PSA because it paid the Bank $2 million for the Bank's agreement not to renew its lease after 2010, and it incurred this expense because the source of the $2 million paid to the Bank was the Bank Credit. The procedure for paying the Bank was set forth in section 12.22.3 of the second PSA:

> 12.22.3 ***Payment of Bank Lease Modification Costs.*** As provided in Section 4.12 from and after the Effective Date, Purchaser [Turtle Creek Partnership] shall have the exclusive right to negotiate any modification or termination of the Bank Lease in its sole discretion, provided however, Seller [TC Dallas] shall pay all Applicable Bank Lease Modification Costs in accordance with

and subject to the further terms of this Section 12.22.3. Before the date on which any Bank Lease Modification Costs are to the [sic] paid, Purchaser shall deliver a Bank Lease Modification Cost Notice to Seller and wire transfer to Seller the amount of the Bank Lease Modification Costs Amount ("Purchaser's Deposit") to be paid. On or before 5:00 p.m. (Dallas, Texas time) on the first Business Day after the day on which the Purchaser delivers the respective Bank Lease Modification Costs Notice and the Purchaser's Deposit, Seller shall: (1) pay the respective Bank Lease Modification Costs to the Designated Payees via wire transfer and (ii) deliver to Purchaser evidence reasonably satisfactory to Purchaser of the payment of said amount to the Designated Payees.

Under this provision, TC Dallas "paid" the Bank by sending the Bank the money TC Dallas received from Turtle Creek Partnership. Likewise, section 12.22.1 of the second PSA stated that Turtle Creek Partnership had the "obligation to fund such costs," that is, the Bank Lease Modification Costs Amount. Thus, under the second PSA, the source of the $2 million paid to the Bank was Turtle Creek Partnership, not the Bank Credit.

Moreover, TC Dallas's duty to transfer Turtle Creek Partnership's money to the Bank does not mean TC Dallas "incurred" a Lease Termination Cost. According to the dictionary, the definition of the word "incur" includes "become liable or subject to ... (incurred large debts to educate his children)." WEBSTER'S THIRD NEW INT'L DICTIONARY 1146 (1981). Thus, assuming without deciding that the $2 million "Bank Lease Modification Costs" paid to the Bank was in connection with terminating the lease,[2] unless TC Dallas was liable to the Bank for that payment it did not "incur" Lease Termination Costs under the first PSA.

The lease modification agreement between the Bank and Turtle Creek Partnership stated, "As additional consideration for Tenant's [the Bank's] agreement to the terms of this Agreement and as a condition precedent to the obligations of Tenant under this Agreement, Landlord [Turtle Creek Partnership] shall pay Tenant the sum of $2,000,000 ...." Thus, it was Turtle Creek Partnership—and not TC Dallas— that was liable to the Bank for, and therefore "incurred," the Bank Lease Modification Costs Amount.

That TC Dallas was not liable to the Bank for (and thus did not "incur") the Bank Lease Modification Costs Amount, was established by section 12.18 of the second PSA, which eliminated the existence of any third-party beneficiaries to the second PSA.[3] See S. Tex. Water Auth. v. Lomas, 223 S.W.3d 304, 306 (Tex.2007) ("The intent to confer a direct benefit upon a third party 'must be clearly and fully spelled out or enforcement by the third party must be denied.'") (quoting MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 651 (Tex.1999)). Because

---

2. One of Republic's arguments in its motion for summary judgment and on appeal is that the $2 million payment could not be a Lease Termination Cost because it was consideration for the Bank's agreeing to modify—not terminate—its lease. However, we need not resolve that issue.

3. That provision stated:

12.18 *No Third Party Beneficiary.* The provisions of this Agreement and of the documents to be executed and delivered at closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing....

the Bank could not enforce the second PSA as third-party beneficiary, TC Dallas could not be liable to the Bank for payment of the $2 million. TC Dallas's only responsibility was to transfer Turtle Creek Partnership's $2 million to the Bank, which did not constitute an incurring of Lease Termination Costs under the first PSA.

The parties' agreements establish as a matter of law that no portion of the $6 million Bank Credit was an O & T Expense under the first PSA for which Republic would be forty percent liable. Accordingly, we conclude the trial court did not err in granting Republic's motion for summary judgment and denying TC Dallas's. We resolve TC Dallas's first issue against it.

### III. ATTORNEY'S FEES

Republic was awarded attorney's fees under a "prevailing party" provision of the first PSA. TC Dallas's second issue is premised on its arguments that Republic should not have prevailed. Because we have rejected TC Dallas's arguments, we need not address its second issue. *See* TEX.R.APP. P. 47.1.

### IV. CONCLUSION

Based on our resolution of TC Dallas's issues, we affirm the trial court's final judgment.